STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

(FOR PUBLICATION)

09-860


WILLIAM E. TROTTER, II

VERSUS

CHARLES M. FIFE, JR. & ASSOCIATES, LLC AND
CHARLES M. FIFE, JR.

**********
APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2005-2902
HONORABLE KRISTIAN EARLES, PRESIDING
**********

SYLVIA R. COOKS
JUDGE

**********
Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Billy H. Ezell, Judges.

**AFFIRMED.**

Simon Law Offices
Barry L. Domingue
P.O. Box 52242
Lafayette, LA 70505
(337)-232-2000

    Attorney for Defendant/Appellants Charles M. Fife, Jr.
    And Charles M. Fife, Jr. & Assoc., LLC

Breaud & Meyers
Alan K. Breaud
Timothy W. Basden
P.O. Box 3448
Lafayette, LA 70502
(337) 266-2200

    Attorneys for Plaintiff/Appellee William E. Trotter, II

**COOKS, Judge**.

## FACTS

On December 31, 2003, Mr. William E. Trotter, II (Trotter) issued a check made payable to Charles M. Fife, Jr. & Associates, L.L.C. (Fife, LLC) in the amount of $350,000.00. Mr. Charles M. Fife, Jr. (Fife) negotiated the check for Fife, LLC, which is wholly owned by Fife. Trotter believed and understood that he was purchasing five royalty acres in a tract of land known as the "Ramos Field," a highly productive gas field with a strong production record preceding that date. Trotter was informed by his long-time, trusted friend, Mr. Albert Stall (Stall), that Fife had a great royalty deal in a very highly productive field with a deep well, a good track record, and good longevity in a particular sand. Stall told Trotter that Fife needed the money right away because there were other buyers interested in the deal. Stall did not tell Trotter there was serious question about Fife's title to these royalty acres. Relying upon his many previous dealings with Stall and Fife, Trotter agreed to purchase the five royalty acres for the sum of $350,000.00 based upon his CPA's examination of production reports provided to her by Fife's employee, Mr. Kim Melancon. (Melancon). No one revealed to Trotter, nor to his CPA, Mrs. Lucinda Fage (Fage) one very important fact– there was serious doubt that any such royalty acres existed. In fact, although Fife, Mr. Kevin Moody (Moody), Stall, Mr. Frenchie Thibodeaux (Thibodeaux) and Mr. Kim Miller (Miller) knew about the highly questionable title to any such purported royalty acres, that information was kept from Trotter. Not only did Stall fail to mention to Trotter the highly questionable nature of Fife's title to these royalty acres, but Fife directed an employee of one of his companies, Melancon, to make the only contact with Fage regarding information she requested on behalf of Trotter. Melancon testified he had no idea there was any question as to whether these

1

royalty acres actually existed nor anything about any issue of good title to these royalty acres at the time he was instructed to contact Fage. When Fife assigned Melancon as his contact with Trotter's representative he, however, knew Melancon had no idea about the speculative title.

The deal put to Trotter was actually put in motion earlier in a meeting attended by Fife, Moody, Thibodeaux, and Miller. In that meeting, sometime before Christmas 2003, Miller, owner of Hector Operating Company (Hector), told the group he believed there were ten available royalty acres in the Ramos Field which could be purchased from Mr. Carl Bauer (Bauer), a record title owner of a tract of land in the Ramos Field. Bauer, a lawyer, banker, businessman and large land owner, previously sold what he believed to be all of his interest in the Ramos Field to Empire Energy Corporation (Empire). He believed he had conveyed all of his interest amounting to twenty-five royalty acres in a royalty deed assigning his interests to Empire.

According to Miller, the land in question was part of a piece of property donated to free slaves right after the Civil War. Miller suggested to the group he thought Bauer might own more royalty acres in the tract than he sold to Empire, but candidly stated that Bauer did not believe he owned anything more than he sold to Empire. Neither Miller nor anyone else at the meeting attempted to determine the validity of Miller's assertion. Instead, they developed a "deal" wherein these alleged ten royalty acres in the Ramos Field would be purchased from Bauer by Hector for the sum of $200,000.00. The purchase would be financed by a thirty-day loan from B.T. Ventures (a joint venture between Moody and Thibodeaux's family-owned companies) as allegedly, neither Hector nor Fife, LLC had the funds necessary to make the purchase from Bauer. Hector would then sell eight royalty acres to B.T. Ventures, which would then sell those eight royalty acres to Fife, LLC. Fife, LLC

2

would immediately sell all eight royalty acres to other parties for a total sum of $525,000.00, including the five royalty acres sold to Trotter for $350,000.00. Hector retained two of the purported ten royalty acres

The Royalty Deed from Bauer to Hector states Bauer "intends" to convey ten royalty acres to Hector, which royalty acres are calculated on the basis of there being 127.65 acres of land in the tract located within the Ramos Field. This deed clearly states that the sale to Hector is "without warranty of title or otherwise whatsoever, even as to return of the purchase price." The deed is dated November 17, 2003, but was not filed of record until December 26, 2003. The joint exhibit entitled "History of Sale," entered into evidence at trial, states this transaction took place on December 26, 2003. Hector transferred eight of the purported ten royalty acres to B.T. Ventures. The deed for this assignment of royalty is dated December 24, 2003, however, the joint exhibit lists the date of the transaction as December 30, 2003. This royalty deed bears a recordation date of December 30, 2003.

According to Moody's testimony, B.T. Ventures then sold its eight royalty acres to Fife, LLC by royalty deed dated January 7, 2004. This deed is not in evidence but the joint exhibit in evidence likewise shows the transaction date as January 7, 2004. Fife, LLC purportedly sold five royalty acres to Trotter as evidenced by a royalty deed signed by Fife on behalf of his LLC, dated December 31, 2003 and filed of record January 7, 2004. The joint exhibit indicates a different transaction date for this assignment of royalty interest as January 7, 2004. This deed, which purports to transfer five royalty acres to Trotter, was not delivered to Trotter's CPA, Fage, until January 7, 2004. Fife admits that neither Trotter nor anyone on his behalf was shown the royalty deed nor told anything about any language in the deed until after it was delivered to Trotter's CPA , Fage, more than a week after Fife

3

negotiated the payment from Trotter. The deed contained a clause stating "Assignor does not warrant title to the Subject Deed either express or implied, even as to the return of the purchase price."

Fage sent a request to Meridian Resource Corporation (Meridian) for a division order reflecting Trotter's newly acquired five royalty acre interest in the Ramos Field. Although Meridian at first sent in a division order affecting the royalty acres purportedly purchased by Trotter, it subsequently sent a letter to Trotter stating the order was sent in error and further stating that in fact he did not own any royalty acres in the Ramos Field because Bauer had previously conveyed all of his acres to Empire. Meridian later informed Trotter that although Bauer had intended to convey twenty-five royalty acres to Empire he actually only had no more than 22.345 royalty acres to convey, therefore he certainly had no royalty acres left to convey to Hector. Fage, on behalf of Trotter, immediately contacted Melancon who assured Fage the problem would be corrected. The title problem was never corrected; and, in fact, the attorney hired by Fife to render a title opinion on the alleged royalty acres, Mr. John W. Grant, rendered an opinion that indicates serious doubt that Bauer could have owned any remaining royalty acres to sell to Hector. Grant further observed that, using Miller's own theory as to how he determined Bauer might own ten royalty acres after his sale to Empire, it is clear Bauer could at best only have possibly owned 3.96 such acres, but even that was doubtful. Despite Meridian's position, no one involved in the matter ordered a formal title opinion and no one took Meridian to task demanding assignment to Trotter of five royalty acres in the ongoing production in the Ramos Field. Trotter has never received any revenue from the Ramos Field production.

Upon learning of the title problem with the royalty acres purportedly transferred to Trotter, Moody and Stall returned a total of $142,500.00 to Trotter.

4

They also returned money to another individual who purchased a smaller royalty interest from Fife, LLC. Although Fife repeatedly promised to return the balance of Trotter's $350,000.00, he never returned any money to Trotter. After Fife's multiple failed promises to fix the title problem and his failure to repay Trotter, suit was filed.

The trial court rendered judgment from the bench finding in favor of Trotter awarding him damages of $207,500.00 plus attorney fees, interest, and court costs. The trial judge found Fife, LLC committed fraud upon Trotter and orally stated he dismissed the claims against Fife individually. The court instructed plaintiff's counsel to prepare a judgment and submit it to opposing counsel for approval. Although the transcript of the proceedings and the court minutes reflect that the court orally stated Fife, LLC committed fraud upon Trotter and specifically dismissed Fife individually, the written judgment signed on December 19, 2008, recites: "there be judgment in favor of Plaintiff, William E. Trotter, II, and against Defendants, Charles M. Fife, Jr. & Associates, LLC, and Charles M. Fife, Jr., individually" and further recites "The court specifically finds that fraud has been committed by Charles M. Fife, Jr., through Charles M. Fife, Jr. and Associates, LLC, in the underlying transaction and the amount awarded herein is for damages arising from fraud." Fife, LLC and Fife individually appeal the final judgment alleging the trial court manifestly erred (1) in failing to enforce the language in the royalty deed which provided the assignment was without warranty of title; (2) in finding Fife personally liable; and (3) in finding fraud was committed. We find there was no manifest error in the trial court's ruling and find there is no merit to Appellants' assignments of error.

## ANALYSIS

We first note that the signed written judgment is the final judgment of the

court. La. Code Civ. P. art. 1911. In *Hebert v. Hebert*, 351 So.2d 1199, p. 1200 (La. 1977) the Louisiana Supreme Court stated:

> [W]e think that the legislature intended to prohibit alterations in the substance of the written judgment after it has been signed by the judge and not alterations in the judge's oral statements from the bench. Otherwise, inadvertent but substantive misstatements once uttered by the trial judge could not be changed except for their phraseology or for corrections of errors in calculation. This result would be unreasonable. It is much more likely that the lawmakers considered the written judgment to be the final judgment which is unalterable in substance. In the event a substantive error nevertheless creeps into the written judgment the aggrieved party has recourse to a timely application for new trial or a timely appeal.

> (Footnotes omitted.)

Thus, we review the December 19, 2008 judgment that entered a judgment against Fife individually and Fife, LLC.

The standard of review on appeal is set forth in *Stobart v. State of La., D.O.T.D.*, 617 So.2d 880, p. 882 (La.1993) (some citations omitted):

> A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of 'manifest error' or unless it is 'clearly wrong.' *Rosell v ESCO,* 549 So.2d 840 (La. 1989). This court has announced a two-part test for the reversal of a factfinder's determinations:

> 1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

> 2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

> *See Mart v. Hill,* 505 So.2d 1120, 1127 (La.1987).

> This test dictates that a reviewing court must do more than simply review the record for some evidence which supports or controverts the trial court's finding. *Id.* The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous.

> Nevertheless, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one.

6

The trial court made determinations of credibility of witnesses and chose between competing views of what transpired. "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Sistler v. Liberty Mut. Ins. Co.*, 558 So.2d 1106, 1112 (La. 1990). *See also Arceneaux v. Domingue*, 365 So.2d 1330 (La. 1978). The record supports the trial court's finding Fife engaged in actions which demonstrate he committed fraud against Trotter. He cannot escape liability for those actions by attempting to invoke the ordinary protection from personal liability afforded by an LLC where his actions constitute fraud. *See Palma v. Crane Services, Inc.* 03-614 (La. 3 Cir. 11/5/03), 858 So.2d 772. Nor can he escape liability for his fraudulent activity by inserting non-warranty language into a royalty deed when such language was never disclosed to the buyer. Moreover, Fife purports to convey title to royalty acres before he acquired title and is unable to show they actually existed.

The evidence shows Trotter, Moody , Thibodeaux, and Stall have known each other for many years and have engaged in many business transactions. Fife and Trotter have also engaged in many business transactions for at least five years prior to this debacle, many of which involve Stall. Because of his past experience and multiple dealings with these individuals, Trotter believed he could trust in honest fair dealing from Fife. He had no reason to imagine that Fife would try to sell him a phantom royalty interest in a producing gas field for a large sum of money. Trotter checked the normal information critical to determining the price he should pay for the five royalty acres being offered to him and presented to him as a "great deal." He had no reason to inquire as to whether Fife's ownership of the royalty acres he wanted to sell was highly suspect. Not only did Fife and his associate Stall conceal this highly relevant information from Trotter, but Fife directed Melancon (an employee of a

7

different oil company owned by Fife) to deal with Trotter's CPA, Fage, knowing that Melancon had been kept in the dark about the highly suspect title to the royalty acres being sold to Trotter. Fife cannot escape liability for his actions by simply claiming that he personally did not engage in direct contact with Trotter. It is Fife personally who assigned his employee Melancon to be the contact with Trotter's agent and to provide her with requested information.

We are unpersuaded by Fife's argument that the non-warranty language contained in the royalty deed purporting to transfer ownership to Trotter protects Fife from liability.

Louisiana Civil Code Article 2548 provides in pertinent part:

> The parties may agree to an exclusion or limitation of the warranty against redhibitory defects. The terms of the exclusion or limitation must be clear and unambiguous **and must be brought to the attention of the buyer.**

**(**Emphasis added.)

As the Louisiana Fourth Circuit Court of Appeal stated in *Royal v. Cook*, 07-1465, p. 12, (La. App. 4 Cir. 4/23/08), 984 So.2d 156, 165-166, *writ denied* 08-1133 (La. 9/19/08), 992 So.2d 941:

> [I]n redhibition, a seller is in bad faith when he knows of the defect in the property that is the subject of the sale but fails to advise the purchaser of the problem. La. C.C. art. 2545. Louisiana law requires that a contract must be formed in good faith. La. C.C. art. 1983. Fraud can result from silence and inaction. La.C.C. art. 1953. (Footnotes omitted).

And, as the Fourth Circuit noted in *Helwick v. Montgomery Ventures, Ltd.*, 95-0765, p.6 (La.App. 4 Cir. 12/14/95), 665 So.2d 1303, 1306:

> A seller with knowledge of a redhibitory defect who, rather than informing the buyer of the defect, opts to obtain a waiver of the warranty implied by law, commits fraud, which vitiates the waiver because it is not made in good faith. (Citation omitted)

Louisiana Civil Code Article 2545 provides in pertinent part:

8

> A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the purchase price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.

The Louisiana Civil Code also provides in article 1953:

> Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.

The defendants argue that just as the language stating there was no warranty of title in the royalty deed from Bauer to Hector protects Bauer, the same language should protect Fife in his royalty deed to Trotter. There is one major difference between the two situations. Bauer was completely candid with Miller regarding the fact that Bauer did not believe, nor did he in any way represent, that he had any royalty acres left to sell in the Ramos Field. His royalty deed to Hector conveys more of what is described in that deed as an "intent" to sell any royalty acres he might own. Miller clearly conveyed that fact to Fife, Moody, Stall, and Thibodeaux before any of them agreed to finance the purchase from Bauer and ultimately sell some of the royalty acres to Trotter. Unlike the above-board dealings with Bauer, the dealings with Trotter did not involve full disclosure of known facts which Fife and the others knew would be extremely important to Trotter. Instead, crucial information was intentionally concealed from Trotter. Additionally, Fife did not advise Trotter of the non-warranty language included in his deed and admits such language was not used in previous conveyances to Trotter. Defendants' assignment of error alleging the court erred in failing to enforce the non-warranty language contained in the assignment to Trotter is without merit. As the Louisiana State Supreme Court held

9

in *Shelton v. Standard/700 Associates*, 01-587 (La.11/16/01), 798 So.2d 60, 64:

> While an exclusion or limitation of the warranty against redhibitory defects is usually effective, LSA-C.C. art. 2548 further provides that "[a] buyer is not bound by an otherwise effective exclusion or limitation of the warranty when the seller has declared that the thing has a quality that he knew it did not have." Under this article, an otherwise effective exclusion or limitation of the warranty against redhibitory defects is not effective if the seller commits fraud, as defined in the civil code, upon the buyer. Thus, although the warranty against redhibitory defects may be excluded or limited, a seller cannot contract against his own fraud and relieve himself of liability to fraudulently induced buyers. *See Roby Motors Co. v. Price,* 173 So. 793, 796 (La.App. 2nd Cir. 1937). Indeed, such a contract would be contra bonos mores and unenforceable.
>
> A contract is formed by the consent of the parties. LSA– C.C. art. 1927. However, consent may be vitiated by error, fraud, or duress. LSA– C.C. art. 1948. "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause loss or inconvenience to the other. Fraud may also result from silence or inaction." LSA– C.C. art. 1953. "Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent." LSA– C.C. art. 1955.
>
> Nevertheless, fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill. However, this exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions of representations. LSA– C.C. art. 1954.

The Supreme Court further stated in *Shelton, Id.:*

> In sum, there are three basic elements to an action for fraud against a party to a contract: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to a circumstance substantially influencing the victim's consent to (a cause of) the contract.

*See also*, *Palma v. Crane Services, Inc.* 858 So.2d at 774-75.

Common sense alone illuminates Fife's motivation for keeping the crucial information from Trotter. There can be no doubt that an experienced businessman as well-seasoned as Trotter in these types of purchases would not have bought

10

supposed royalty acres from Fife, or anyone, if he knew that Bauer did not believe he owned any royalty acres when he sold his "intention" to convey any such acres he might own to Hector, who in turn sold to B.T. Ventures, who then sold the same to Fife. There is no other word for what was perpetrated on Trotter than "fraud." The fraud was not perpetrated by some fictional entity known as an LLC, it was perpetrated by the individual known as Charles M. Fife, Jr., and the trial court was entirely correct in assigning personal responsibility for the fraud to Fife.

Our law does not allow an individual guilty of fraud to hide behind any mantle of protection from personal liability ordinarily accorded LLCs and corporations. Louisiana Revised Statutes 12:1320(D) specifically provides:

> Nothing in this Chapter shall be construed as being in derogation of any rights which any person may by law have against a member, manager, employee, or agent of a limited liability company because of any fraud practiced upon him, because of any breach of professional duty or other negligent or wrongful act by such person, or in derogation of any right which the limited liability company may have against any such person because of any fraud practiced upon it by him.

In *Watson v. Big T Timber Co., Inc.*, 382 So.2d 258, 263 (La.App. 3 Cir. 1980) we found the defendant personally liable, *in solido,* with his corporate entities and found he enjoyed no protection from personal liability when he intentionally concealed information from the plaintiff to secure an unjust advantage:

> The record reflects that Thigpen concealed facts known to him, which if known to Vancouver would have prevented the sale, with the intent to take unjust advantage of Vancouver by insulating himself from personal liability for return of the purchase price. The assets of the two corporations used were clearly not substantial. Thigpen, the sole stockholder of the two corporations, used both corporate structures to avoid personal liability, having concealed information (that he should have revealed) to the detriment of Vancouver.

> Since Thigpen intentionally concealed information that would reveal that Vancouver would not enjoy peaceable possession, to Vancouver's detriment, while revealing other title information, and he unjustly used the corporate entities to absolve himself from personal liability on the warranty, this court will disregard the corporate fictions.

11

We hold Thigpen is personally liable, in solido, with Big T Timber and Florida Investments for breach of warranty.

Likewise, Fife, as set forth above, concealed from Trotter information he fully knew and understood which he knew was critically important for Trotter to assess whether he would make the purchase at all, and if so, for what price. Then, Fife included language intended to shield himself from liability in the royalty deed he drafted and signed without bringing such language to Trotter's attention. Additionally, Fife chose to assign the task of communicating with Trotter's representative to one of his employees working for a sister company owned by Fife who Fife knew did not know anything about the speculative nature of the existence of the purported royalty acres. For these reasons we find defendants' assignments of error asserting Fife is not personally liable and asserting no fraud was committed are without merit.

## DECREE

For the reasons stated above, the judgment of the trial court is affirmed. All costs of this appeal are assessed to Defendants-Appellants.

**AFFIRMED.**

12