Billings, Thomas P., J.
OpenRisk LLC (“OpenRisk”) is a Delaware limited liability company. It was formed to develop a platform to estimate the potential financial loss to a portfolio of real property resulting from natural disasters such as earthquakes, floods, tornadoes, and hurricanes. The plaintiffs (herein, the “Derivative Claimants,” collectively with OpenRisk, the “OpenRisk Parties”) are members and managers of OpenRisk. They brought this derivative action against the defendants, former high-level OpenRisk employees (the “Former Employees”) who resigned their employment on October 11, 2011. OpenRisk, on whose behalf the claims are brought, is a nominal defendant.
Greatly summarized, the complaint alleges that the Former Employees misappropriated the intellectual property comprising the OpenRisk platform, and are working toward taking it to market ón their own. The former Employees, on the other hand, claim that Mathai developed the source code in question before joining OpenRisk, and that his claim to it was preserved in a Prior Inventions Agreement between himself and OpenRisk. At the heart of the dispute, then, is the question of who actually owns the intellectual property that both sides are attempting to develop as a commercially viable product.
This Motion concerns the claims that the Former Employees have asserted; by way of an amended counterclaim and an amended cross claim (the “Counterclaim” and the “Cross Claim”), against the Derivative Claimants and OpenRisk, respectively. There are eight counts in the Counterclaim and seven in the Cross Claim, as follows.
Amended Counterclaim:
1. Violation of G.L.c. 149, §148 et seq.
2. Defamation.
3. Tortious Misrepresentation.
4. Breach of Contract.
5. Conversion.
6. Intentional and Negligent Interference with Advantageous and/or Prospective Business Relationships.
7. Breach of Fiduciary Duty.
8. Fraud, Negligent, and Intentional Misrepresentation.
Amended Cross Claim:
(Same as in the Counterclaim, except that Count 7, “Breach of Fiduciary Duty,” is omitted and the count for “Fraud, Negligent, and Intentional Misrepresentation” is numbered 7.)
The allegations of each count (which are substantially identical as between the matching counts in the Counterclaim and the Cross Claim) are further summarized below, to the extent necessary.
*486 DISCUSSION
1. Procedural Matters
To withstand a Rule 12(b)(6) motion to dismiss, a plaintiffs complaint must contain “allegations plausibly suggesting (not merely consistent with) an entitlement to relief, in order to reflect [a] threshold requirement . . . that the plain statement possess enough heft to sho[w] that the pleader is entitled to relief.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-57 (2007) (internal quotations omitted). While a complaint need not set forth detailed factual allegations, a plaintiff is required to present more than labels and conclusions, and must raise a right to relief “above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact).” Id.
A Rule 12(b)(6) motion to dismiss is addressed primarily to the face of the complaint. The Court may also consider documents attached to or explicitly referenced in the complaint and, in an appropriate case, matters of public record. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004); Harhen v. Brown, 431 Mass. 838, 840 (2000); Schaer v. Brandeis University, 432 Mass. 474, 477 (2000). [1]
With these principles in mind, I turn to the various Counts asserted by way of counterclaim and cross claim.
2. Count One: The Wage Act
The Counterclaim and Cross Claim allege that OpenRisk is a Delaware Limited Liability Company with its principal office in Belmont, Massachusetts. The individual Derivative Claimants are all Massachusetts residents. Mathai, a New Jersey resident, served as OpenRisk’s Executive Vice President and Chief Technology officer; Mumane, a Maryland resident, was its Senior Vice president; and Ott, a New Jersey resident, was its President. The Service Agreements with all three provided that their “principal location will be at the OpenRisk office” in Cranbury, New Jersey.[2] There is no allegation that any of them performed any substantial services in Massachusetts.
Count One asserts claims under the Wage Act for unpaid salaiy, vacation benefits, and retirement funds for the three-and-one-half-month period from July 2011 through October 11, 2011. It appears undisputed in the pleadings that the Former Employees were not paid after June of 2011. The primary question on the Motions to Dismiss, therefore, is whether the Act applies to these employees.
The Wage Act imposes obligations on “[e] very person having employees in his service .. .” G.L.c. 149, §148. It does not expressly define its intended territorial reach; nor does any appellate decision of which I am aware.[3] At least two trial court decisions, however, have held that applicability of the Wage Act is determined by the situs of the work. Telford v. Iron World Mfg. LLC, 680 F.Sup.2d 337, 342 (D.Mass. 2010) (holding the Act applicable where employee worked three days a week in Massachusetts); Hadfield v. A.W. Chesterton Co., 2009 WL 3085921, 26 Mass. L. Rptr. 101 (Mass.Super. 2009; Fremont-Smith, J.) (Act did not apply to sales manager for Massachusetts company’s sub-Saharan Africa territory, even though he traveled regularly to the home office in Woburn; “Generally, statutes are presumed not to apply ex-traterritorially unless there is clear legislative intent to the contrary”).
More recently, a colleague in this session has held that a salesman who lived in Florida and “conducted his business largely via the internet..., but who also traveled throughout the United States, as salesmen are wont to do, in order to serve the company’s customers and further the company’s business” was protected by the Wage Act, where “his business address was in Massachusetts and his contact information was a Massachusetts telephone number and Massachusetts fax number.” He “had customers in at least thirty states, including between eleven and nineteen customers in Massachusetts . . . , traveled to at least twenty of those states, including Massachusetts,” and used a cubicle in the company’s only office, located in Massachusetts, when he was in town. The court deemed these to be “more than sufficient contacts with Massachusetts to afford [the employee] the protection of the Wage Act.” Dow v. Casale, 2011 WL 6379286 (Mass.Super. 2011; Lauriat, J.) [29 Mass. L. Rptr. 132].
Plainly, the work of a traveling salesman such as Mr. Dow does not easily lend itself to a traditional “situs” test. The Former Employees, however, were not traveling salesmen; they were IT professionals working out of a New Jersey office and/or their homes in New Jersey and Maryland. Neither the language of the Wage Act, nor any case decided under it, suggests that the Act should apply to a person employed outside Massachusetts, simply because the employer is headquartered here and the employee occasionally visits the home office on company business.
The Wage Act therefore does not apply to the claims asserted in this case. That does not, however, quite end the matter. In a footnote (p. 6, n.5) to the brief in support of their motion to dismiss, the Derivative Claimants have assured the Court that
[t]he Former Employees are not left without a remedy; indeed, they can continue to pursue claims in other forums where they have previously filed administrative charges. Indeed, their filings in other states reflect their knowledge and understanding that given their residences and work location, they have no legal right to bring a Massachusetts Wage Act claim. [4]
The polite term for this would be “disingenuous.” Public records from New Jersey and Maiyland — submitted with the Former Employees’ motion papers— *487 disclose that well before filing its motion to dismiss, OpenRisk had succeeded in obtaining dismissals in the very administrative agencies in which it now contends the wage claims belong, on the ground that the claims should be arbitrated in Boston. More particularly:
Mathai and Ott filed claims in the New Jersey Division of Wage & Hour Compliance in or before December 2011. There followed several telephone conversations between the Division and OpenRisk’s counsel, who said (among other things) that the employees had agreed to arbitrate their claims in Boston, that a hearing was scheduled before Judge Lauriat on March 7, 2012, “and there may be a ruling regarding arbitration at that time.”[5] On May 17, the Division advised both Ott and Mathai that it was closing its file “as wage claims are being heard in Suffolk Superior Court in Boston, Mass.,” but that they could re-contact the office “if the claim is withdrawn from that venue.”
As New Jersey went, so went Maryland. Mumane filed a claim on January 17,2012 before that State’s Department of Labor, Licensing and Regulation. The Department duly notified OpenRisk of the claim by letter dated January 24, 2012, and heard back from OpenRisk’s counsel by letter dated February 7,2012. First among the defenses asserted was that the claim “must be arbitrated in Boston, Massachusetts under the claimant’s Service Agreement.” Counsel also provided copies of various documents, including the Verified Complaint and docket in this case and the Former Employees’ demand letter under the Massachusetts Wage Act. On February 10, the Department notified Murnane and OpenRisk that because Mumane was represented by counsel “and there is a pending court case,” it was closing the file.
This is not quite a case of judicial estoppel, in that OpenRisk — although it succeeded, at least in the short term, in thwarting the Former Employees’ efforts to present their claims in New Jersey and Maryland— does not appear to have argued that the Massachusetts Wage Act applied to those claims. See Otis v. Arbella Mut. Ins. Co., 443 Mass. 634, 640 (2005) (for judicial estoppel to apply, “the position being asserted in the litigation must be ‘directly inconsistent,’ meaning ‘mutually exclusive’ of, the position asserted in a prior proceeding”; citation omitted).
Still, one is struck by the fact that contrary to their position before the New Jersey and Maryland agencies, the OpenRisk parties have never actually sought arbitration of the wage claims. Instead, they have requested that the Court rule on the merits of those claims, which I have done. The OpenRisk parties have thus waived their right to arbitrate, even assuming those claims would fall within the narrow language of the arbitration clause in question.[6] See Home Gas Corp. of Mass., Inc. v. Walter’s of Hadley, Inc., 403 Mass. 772, 775 (1989) (“[A] party must ‘proceed with dispatch in seeking arbitration’ if it does not wish to waive that right”; citations omitted).
Count One is therefore dismissed, with the firm expectation that the OpenRisk plaintiffs/defendants-in-counterclaim will cooperate in the Former Employees’ efforts to have their claims reinstated in the New Jersey and Maryland agencies where they belong. Should reasonable efforts toward this end prove unsuccessful for any reason, the Former Employees may seek appropriate relief in this Court.
3. Count Two: Defamation
Count Two (and also Counts Three and Six; see below) in the Counterclaim and in the Cross Claim arise from two letters, substantially identical, written by OpenRisk’s counsel and addressed to companies with which OpenRisk had done business. Each letter stated that the Former Employees had left OpenRisk’s employ; that OpenRisk had learned that in several instances, they had represented to third parties that they were still affiliated with OpenRisk; that they had failed to return intellectual properly belonging to OpenRisk; and that OpenRisk had commenced the present action. The letters closed as follows:
Accordingly, OpenRisk requests that [the addressee] cease and refrain from doing any work and making any efforts to commercialize the OpenRisk property with these former employees. The OpenRisk platform (and Platform demos), the CAT RISK Index and OpenRisk Trading Exchange products and related information are the exclusive property of OpenRisk. These former, employees have no authority whatsoever to hold themselves or their agents out as representatives of OpenRisk and its intellectual property.
To be clear, OpenRisk’s intent by this letter is not to shut the door on its relationship with [the addressee] but only to enforce its intellectual property rights, and to make clear to its partners the existence and basis of the litigation with the three former employees. This matter involves confidential information and property of OpenRisk that has to be kept confidential for competitive reasons. Open-Risk intends to pursue its remedies in its lawsuit against the former employees and to protect its intellectual property and commercial rights to the fullest extent possible under the law.
I look forward to hearing from you promptly.
As a result of the letters, IBM — not one of the addressees, but “a prime professional contact oF the Former Employees — is no longer willing to work with them pending resolution of this dispute.
The defendants respond that the letters are protected by the “litigation privilege,” and that the Derivative Claimants are shielded from individual liability by the LLC they created (OpenRisk) and the statute *488 under which it was created. These arguments are considered in turn.
A. The Litigation Privilege
“It is well established that statements made by a witness or party during trial, if ‘pertinent to the matter in hearing,’ are protected with an absolute privilege against an action for defamation.” Correllas v. Viveiros, 410 Mass. 314, 320 (1991). The privilege applies not only where litigation that is pending, but also to communications (e.g., a demand letter or a cease-and-desist letter) that are preliminary to contemplated litigation.
[Statements by a party, counsel or witness in the institution of, or during the course of, a judicial proceeding are absolutely privileged provided such statements relate to that proceeding . . . [T]he privilege attaches “where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences or other communications preliminaiy to litigation.”
****
Where a communication to a prospective defendant relates to a proceeding which is contemplated in good faith and which is under serious consideration, . . . the privilege should attach.
Sriberg v. Raymond, 370 Mass. 105, 108 (1976) (citation omitted). The privilege is absolute, extending even to statements “uttered maliciously or in bad faith,” Doe v. Nutter, McClennen & Fish, 41 Mass.App.Ct. 137, 140 (1996), and it “applies not only to defamation claims brought against the attorney, but to civil liability generally.” Bartle v. Berry, 80 Mass.App.Ct. 372, 378 (2011).
Although “[t]he words ‘pertinent to the proceedings’ are not to be construed narrowly,” Aborn v. Lipson, 357 Mass. 71, 73 (1970), they do have substance. There is, for example, no “shield of immunity for defamation where there is not serious consideration of suit.” Sriberg at 108. In other words, the privilege does not “encompass . . . attorneys’ conduct in counselling and assisting their clients in business matters generally.” Kurker v. Hill 44 Mass.App.Ct. 184, 192 (1998).
A line of federal cases applying Massachusetts law has held that in some circumstances, the privilege may extend to an attorney’s communications to persons not party to the pending or contemplated litigation, or to communications by an attorney for a non-party to the litigation. See, e.g., Blanchette v. Cataldo, 734 F.2d 867 (1st Cir. 1984) (communication by attorney for Penn Central Railroad with an officer of Santa Fe Railroad, against whom a freight agent (Cataldo) had asserted numerous claims, which caused Santa Fe to break off settlement talks with Cataldo, was privileged, where the freight in question was carried by both railroads and they had agreed to apportion liability for the claims); Leavitt v. Bickerton, 855 F.Sup. 455 (D.Mass. 1994; Young, D.J.) (communications with nonparty witnesses, who were employers of the plaintiff); and Loomis v. Tulip, Inc., 9 F.Sup.2d 22, 26 (D.Mass. 1998; Tauro, C.J.) (communication by attorney for one party in dispute over control of inventoiy and equipment to discourage commercial landlord from dealing with the other side was privileged, where the ability to lease the space “appears to have determined which of [the disputants] maintained control of the inventoiy and equipment at issue in the supervening litigation”).
Leavitt is easy to understand; interviewing witnesses is a core function of trial work. Blanchette, too, is comprehensible, since the attorney there represented a company that was a party in all but name to the pending litigation. Loomis, on the other hand, seems to me to extend the privilege well beyond the development, to date, of this aspect of the common law in the Massachusetts courts, and I decline to follow it.[7]
Returning to the present case, the letters in question were not pertinent to this litigation. They were not preliminary to it, nor part of pretrial proceedings or preparations, and they conferred no advantage in it. They were not a result of, nor adjunct to, the court proceeding; nor were they “the functional equivalent of. . . traditional litigation instruments,” as in Powell v. Stevens, 69 Mass.App.Ct. 87 (2007) (“concluding that the filing of a lis pendens memorandum in connection with litigation affecting the title to real estate lies within the absolute privilege afforded judicial proceedings”).[8] Each of the addressees may have a keen spectator’s interest in the outcome of the court case, but neither has sought to intervene and no one has sought to join them as parties.
Nor was either letter preliminaiy to other contemplated litigation. Each letter disclaims any intention on OpenRisk’s part “to shut the door on its relationship with” the addressee, and stresses that it is “pursu[ing] its remedies in the lawsuit against the former employees”; there is no suggestion that further litigation, against the addressees or anyone else, is under serious consideration. The letters may or may not have been actionable — this will depend on facts not developed in the Counterclaim, the Cross Claim, or the motion papers — but they were not protected by the litigation privilege.
B. Individual Liability of the Derivative Claimants
There is still the question of whether the Derivative Claimants — in addition to OpenRisk — may be held liable for defamation. The Delaware Limited Liability Company Act[9] provides:
Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and *489 liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.
18 Del. C. §18-303(a).[10]
That one is not personally liable in contract or tort “solely by reason of being a member or acting as a manager of the limited liability company” does not mean, however, that personal liability may never attach for activities undertaken on the LLC’s behalf. Although the Delaware courts have not yet addressed the question,[11] the courts of other jurisdictions appear to be in general agreement that just as with a traditional corporation, an LLC member or manager is liable for torts that s /he committed personally, [12] and that a member or manager who executes a contract in his personal capacity (for example, as a guarantor or co-signer on the LLC’s debt) is jointly liable on the contract.[13] Both principles are firmly established in the law of traditional business corporations; neither undercuts the statutory assurance of immuniiy from liability “solely” on account of member or manager status. I am confident that both apply to a Delaware LLC, and I note that in the only published decision of which I am aware that has considered question, the Connecticut Supreme Court has held that the formation of a Delaware LLC does not shield its principals from liability for their own torts. Weber v. US Sterling Securities, Inc., 924 A.2d 816 (Conn. 2007).
Returning to the present case, the Amended Counterclaim and the Amended Cross Claim attribute the allegedly defamatory letters to the Derivative Claimants, though there is no particularization of who among them did what. Although the letters were written on behalf of OpenRisk and no person was expressly “cc’d” on it, this is a case where one may plausibly assume that one or more of the Derivative Claimants requested of the LLC’s counsel that the letters be written; provided the information and/or misinformation upon which they were based; and likely reviewed and approved a draft. It is also unlikely that the Former Employees could be any more specific than they have been concerning each member’s or manager’s involvement, absent discovery. Count Two therefore satisfies both the substantive law of tort liability for members and managers of an LLC, and a reasonable application of the Iannacchino pleading standard. The motion to dismiss Count Two is therefore denied as to both OpenRisk and the Derivative Claimants.
4. Count Three: Tortious Misrepresentation
CountThree, for ‘Tortious Misrepresentation,” alleges:
That in order to induce the Former Employees to join OpenRisk, the LLC and its principals falsely stated “that the Company would possess investment capital in the amount of $2,000,000.00"; that the Former Employees relied on these statements in deciding to sign up; but that the capital ’’was never provided";
That OpenRisk and its principals “have actively damaged the reputations of the” Former Employees by sending the letters that are the subject of the defamation claim; and
That OpenRisk and its principals are marketing and developing intellectual property that was developed by, and belongs to, Shajy Mathai, “negligently and intentionally misrepresent[ing] to third parties that they own and thus have the right to control this property.”
The first of these allegations, as it is articulated in Count Three, would fall prey to the familiar rule that “[a] statement on which liability for fraud may be based must be one of fact; it may not be one of opinion, or conditions to exist in the future, or matters promissory in nature,” Yerid v. Mason, 341 Mass. 527, 530 1960), “unless the promisor had no intention to perform the promise at the time it was made,” Cumis Ins. Society, Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 474 (2009).[14] Elsewhere, however — in Count Eight of the Counterclaim and Count Seven of the Cross Claim— the Former Employees have alleged that the $2 million in investment capital “was never provided and was never intended to be provided’ (emphasis supplied). This is enough to bring the claim within the “false promises” rule, at least as against OpenRisk.
An individual who made the false promise would also be subject to personal liability. See discussion in Part 3B, supra. It seems unlikely that the promise was delivered by OpenRisk’s management team as a Greek chorus. The identity of the speaker(s) would be known to the Former Employees, yet nowhere does the Counterclaim or the Cross Claim specify which individual(s) spoke on OpenRisk’s behalf. The Counterclaim against the Derivative Claimants, therefore, fails under basic pleading standards and especially, in a fraud count, under the particularity requirement of Rule 9(b).
The second and third statements alleged in Count Three do not satisfy the basic elements of a misrepresentation claim, whether against OpenRisk or its principals.
To recover in an action for deceit, “the plaintiff must prove ‘that the defendant [or its agent], made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to [its] damage.’ ”
International Totalizing Sys. v. PepsiCo, Inc., 29 Mass.App.Ct. 424, 431 (1990), quoting Danca v. Taunton Sav. Bank, 385 Mass. 1, 8 (1982) (emphasis supplied). Similarly,
*490 [i]n order to recover for negligent misrepresentation, a plaintiff must prove that the defendant, in the course of his business, made a false representation of material fact for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff did rely upon the representation as true, to his damage.
Kitner v. CTW Transp., Inc., 53 Mass.App.Ct. 741, 749 (2002) (emphasis supplied). False statements to third parties that damage the plaintiff may fit under another, recognized form of action (defamation, interference with contractual or advantageous relations, etc.), but they do not make out a claim for misrepresentation as the common law uses the term.
Count Three thus states a claim against OpenRisk only, and only to the extent it alleges a false promise by OpenRisk of a $2 million capitalization. There being no good reason for multiple counts asserting the same cause of action on the same theoiy, however, Count Three is dismissed in its entirety in favor of its better-pleaded equivalent, Count Seven of the Cross Claim (insofar as it pertains to the false promise of capitalization).
5.Count Four: Breach of Contract
Count Four alleges:
That defendant Mathai and the OpenRisk Parties signed a Prior Inventions Agreement, by which both sides recognized that Mathai was the rightful owner of certain intellectual property inventions, but that the OpenRisk Parties have been falsely representing to third parties that they own and have the right to control the inventions; and
That under the Service Agreements executed with each of the Former Employees, the OpenRisk Parties agreed to compensate them for their services, but have failed to pay them for the last three and one-half months that they worked.
Each of these allegations states a valid contract claim against OpenRisk, which has not moved to dismiss Count Four. The claims against the Derivative Claimants, on the other hand, run afoul of the statutory protection of 18 Del.C. §18-303(a), discussed in Part 3B, supra. Review of the three Service Agreements and the Mathai Prior Inventions Agreement[15] discloses that each bore a signature line for the employee, and:
THE COMPANY:
OpenRisk LLC
By: James Aylward
Chief Executive Officer
None of the Derivative Claimants, in other words, signed in his individual capacity; the contracts were between the employee and OpenRisk, alone. Count Four of the Counterclaim is therefore dismissed.
6.Count Five: Conversion
Count Five alleges that before OpenRisk was formed (and so before he became its employee), Mathai developed the source code that underlay product that OpenRisk, with the assistance of the Former Employees, attempted to develop and bring to market. “The source code was properly recorded on Mathai’s Prior Inventions Agreement,[16] the source code is intellectual property which is owned by Counterclaim Plaintiff Shajy Mathai,” but OpenRisk and the Derivative Claimants have claimed ownership of it and have attempted to license it to others.
The OpenRisk parties have responded that intellectual property and other intangibles cannot be the subj ect of a civil action for conversion. This proposition does have support in several federal district court cases (see, e.g., John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 186 F.Sup.2d 1, 28-29 (D.Mass. 2002; Young, J.), and cases cited) and in at least one decision from this Court, Export Lobster Co. v. Bay State Lobster Co., 1994 WL 902930 (Mass.Super. 1994; Doerfer, J.), but the Massachusetts appellate courts do not appear to have faced the issue head-on in a civil case.[17] In any event, whether or not intellectual property is susceptible to a traditional civil claim of conversion, no such claim is alleged in this case. The tort of conversion has as one of its elements that the defendant acquired the property wrongfully, or else that he refused to return it after demand. Atlantic Finance Corp. v. Galvam, 311 Mass. 49, 50 (1942). For all that appears in the allegations supporting Count Five, OpenRisk may have acquired the intellectual property in question with Mathai’s consent while he was still on the OpenRisk team, and the Counterclaim and Cross Claim do not allege that demand has been made and refused.
This does not, however, mean that Count Five has failed to state any claim upon which relief may be granted. Massachusetts law recognizes and routinely enforces claims for misappropriation of trade secrets, without superimposition of the principles of common-law conversion. The elements of such a claim are that the plaintiffs technology or information is in fact a trade secret (that is, that it is both secret and commercially valuable); that the plaintiff has taken reasonable steps to preserve its secrets; and that the defendant acquired and used it by improper means (often, by breaching a duty of confidentialily). See Massachusetts Superior Court Civil Practice Jury Instructions, §§15.42ff, and cases cited. These elements are adequately alleged in Count Five, and the fact that the Count was misnamed as one for conversion does not warrant dismissal. See Independence Park, Inc. v. Board of Health of Barnstable, 403 Mass. 477, 482 (1988) (“a plaintiff can withstand a motion to dismiss if he has alleged facts that entitle him to any form of relief, even if he has not alleged the correct legal theoiy in his complaint”). The motion to dismiss is therefore denied as to Count Five, insofar as it states a claim for misappropriation of trade secrets.
7.Count Six: Interference with Advantageous and/or Prospective Business Relationships
Count Six repeats the allegations of Count Two, for defamation, and asserts that OpenRisk’s counsel, in *491 airing the parties’ dispute in front of third parties with which each side hopes to continue doing business, unlawfully interfered with the Former Employees’ advantageous relations with these companies.
To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant’s interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.
Blackstone v. Cashman, 448 Mass. 255, 260 (2007). In this case, the element of impropriety of motive or means is satisfied by the allegation that the letters made “fraudulent! ]” assertions of ownership of the disputed technology.
The defendants’ response — that the letter was protected by the litigation privilege — was addressed and rejected in connection with Count Two, and my ruling applies equally here, as does the ruling that the claim sufficiently alleges personal involvement by the Derivative Claimants to survive a motion to dismiss. The motion to dismiss Count Six is therefore denied as to both OpenRisk and the Derivative Claimants.
8. Count Seven of the Counterclaim: Breach of Fiduciary Duty
In Count Seven of the Counterclaim, the Former Employees assert that the Derivative claimants owed a fiduciary duty to OpenRisk and its employees, which they violated by failing to pay the Former Employees’ wages in a timely manner. Under Delaware law, however, the fiduciary duties of an LLC member or manager “are to the corporation itself and its shareholders, not employees.” Gilliland v. St Joseph’s at Providence Creek, 04C-09-042 (Del.Super. 2006), citing Agostino v. Hicks, 845 A.2d 1110, 1122 & n.54 (Del.Ch. 2004). Count Seven of the Counterclaim will therefore be dismissed.
9. Count Eight (Counterclaim)/Count Seven (Cross Claim): Fraud, Negligent, and Intentional Misrepresentation
Count Eight of the Counterclaim and Count Seven of the Cross Claim assert that the OpenRisk Parties made misrepresentations to the former Employees and to third parties. Specifically:
The Former Employees were told “that the Company would possess investment capital in the amount of $2,000,000.00. This capital was never provided and never intended to be provided”;
The OpenRisk Defendants are marketing and developing intellectual properly belonging to Mathai, and “continue to negligently and intentionally misrepresent to third parties that they own and thus have the right to control this property”;
In the Service Agreements, the OpenRisk parties promised to compensate each Former Employee, but later failed to pay their salaries for a three and one-half month period; and
The letters from OpenRisk’s counsel to third parties “contain[ed] false and misleading information.”
The first, second, and fourth of these allegations echo allegations made in earlier Counts, and the legal issues presented by them have been discussed previously. As discussed above in connection with Count Three, the first allegation of a false promise of capitalization states a claim against OpenRisk but not against the Derivative Claimants, and the alleged statements and letters to third parties (second and fourth allegations) do not state a claim for fraud. The third allegation — that OpenRisk promised to pay the Former Employees, and didn’t— does not allege that the promise was false when made, and therefore does not state a claim.
Count Eight of the Counterclaim is therefore dismissed in its entirety, and Count Seven of the Cross Claim is dismissed except insofar as it alleges a false promise by OpenRisk of future capitalization.
ORDER
For the foregoing reasons the Motions to Dismiss, addressed to the counterclaim and the Cross Claims, are:
1. ALLOWED as to Count One of the Counterclaim and the Cross Claim; Count Three of the Counterclaim and the Cross Claim; Count Four of the Counterclaim; Count Seven of the Counterclaim; Count Eight of the Counterclaim; and so much of Count Seven of the Counterclaim as pertains to matters other than the false promise of future capitalization; and
2. DENIED as to Count Two of the Counterclaim and the Cross Claim; Count Five of the Counterclaim and the Cross Claim insofar as they state a claim for misappropriation of trade secrets; Count Six of the Counterclaim and the Cross Claim; and so much of Count Seven of the Cross Claim as pertains to a false promise of future capitalization.
3. The dismissal of Count One is with the expectation that the OpenRisk defendants will cooperate in the Former Employees’ efforts to have their claims reinstated in the New Jersey Division of Wage & Hour Compliance (Ott and Mathai) and the Maryland Department of Labor, Licensing and Regulation (Mumane). “Cooperation” in this sense means waiving any defense of arbitrability or prior pending action, but not substantive defenses. Should reasonable efforts toward this end prove unsuccessful for any reason, the Former Employees may seek appropriate relief in this Court.
4. Count Four of the Cross Claim, as to which there was no motion to dismiss, remains in the case.

 Some of the extra-complaint materials tendered by each party are admissible under these principles. Affidavits and certain other materials tendered by the Former Employees, however, are not. See separate ruling on the OpenRisk Parties’ Motions to Strike.

 Each Former Employee’s Service Agreement also has a clause which provides, ‘This Agreement shall be interpreted and governed by the laws of the Commonwealth of Massachusetts and without regard to conflict of laws principles.” Because the clause “makes no reference to statutory causes of action,” however, it does not determine the applicability of the Wage Act. Melia v. Zenhire, Inc., 462 Mass. 164, 175 (2012).

 In Melia v. Zenhire, Inc., 462 Mass. 164 (2012), the SJC considered the mirror-image of this case, and concluded that a New York court, looking to New York choice-of-law rules, would apply the Massachusetts Wage Act to the claims of a Massachusetts resident who worked out of a Boston office for the defendant, a Delaware corporation headquartered in New York State. The court therefore held that the employment agreement’s forum selection clause, which required that disputes be litigated in the New York courts, was not an illegal “special contract” or “antiwaiver provision” that vitiated the Act’s statutory protections. Id. at 170-71. The court also noted that New York law looks, in employment disputes, to “the law of the place of performance, or, in the alternative, by the law of the [S]tate having the most significant contacts with the matter in dispute,” with consideration of any “strong governmental interests” underlying the “conflicting laws.” Id. at 176 (citations and internal quotations omitted).

 OpenRisk’s motion states that it joins in all of the arguments advanced by the Derivative Claimants.

 In fact, what Judge Lauriat heard on March 7 was the Former Employees’ motion to dismiss the complaint, one ground for which was the arbitration clause in each Service Agreement. OpenRisk successfully argued that the duties which the Complaint alleged the Former Employees had arose from file LLC’s Operating Agreement as well as from the Service Agreements, and that the Operating Agreement expressly trumped any conflicting provision in an “Ancillary Document,” defined to include the Service Agreements. The motion to dismiss — which asserted other grounds as well— was denied. If the Division was advised of this ruling, its file does not reflect this.

 The Service Agreements, at ¶5.6, require arbitration of “disputes arising out of or relating to the interpretation and enforcement of this Agreement," without mention of statutory claims.

 The claim that the Loomis court dismissed was one for tortious interference with prospective contractual relations. It might be that the communication at issue was not improper in motive or means — the district court’s opinion is very short on specifics — but to hold that an attorney may defame his client’s adversaries and competitors with impunity to anyone he pleases, so long as he entertains a well-founded hope of advantaging the client in a dispute that might some day blossom into litigation, is to boldly go where no Massachusetts court has gone before.

 Unlike a memorandum of lis pendens, moreover, the letter went well beyond informing the addressees of the existence of litigation; it made specific allegations of misconduct and requested that the addressees terminate their business relationships with the Former Employees.

 Because OpenRisk was incorporated in Delaware, the law of that state governs its “internal affairs — matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders.” Harrison v. NetCentric, Inc., 433 Mass. 465, 469 (2001), quoting Atherton v. Federal Deposit Ins. Corp., 519 U.S. 213, 224 (1997), and Edgar v. MITE Corp., 457 U.S. 624, 645 (1982).

 The Massachusetts LLC statute, like those of many American jurisdictions, follows the Delaware model and has an identical provision. G.L.c. 156C, §22.

 In Pepsi-Cola Bottling Co. v. Handy, No. 1973-S, 2000 WL 364199, at *3-4 (Del.Ch. Mar. 15, 2000), the Chancery Court held that where the alleged tortious acts were committed prior to the LLC’s formation, liability was not being imposed “solely” on account of the defendants’ membership.

 See, e.g., People v. Pacific Landmark, LLC, 29 Cal.Rptr.3d 193 (Cal.Ct.App. 2005) (California law); Sturm v. Harb Dev., LLC, 298 Conn. 124, 2 A.3d 859 (2010) (Connecticut law); Luna v. A.E. Eng'g Servs., LLC, 938 A.2d 744, 748 (D.C. 2007) (District of Columbia law); Estate of Countryman v. Farmers Coop. Assn, 679 N.W.2d 598, 603-04 (Iowa 2004) (Iowa law); Trotter v. Charles M. Fife, Jr. & Associates, LLC, 36 So.3d 426, 433-34 (La.App. 2010) (Louisiana law); Allen v. Dackman, 991 A.2d 1216, 1228 (Md. 2010) (Maryland law); Department of Agriculture v. Appletree Marketing, L.L.C., 779 N.W.2d 237 (Mich. 2010) (Michigan law); Charter, L.L.C. v. Air America Jet Charter, Inc., No. 14-08-00534-CV, 2009 WL 4794242 (Tex.App. Dec. 15, 2009) (Texas law).

 E.g., Thomas v. Capital Medical Management Associates, LLC, 985 A.2d 51 (Md.App. 2009); HSBC Bank USA, National Association v. Laniado, 897 N.Y.S.2d 514 (App.Div.2d Dept. 2010); Losh Family, LLC v. Kertsman, 228 P.3d 793 (Wash.App. 2010).

 The same principles apply to a claim of negligent misrepresentation. Cumis Ins. Society, Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 474 (2009).

 The copy of the Prior Inventions Agreement tendered with the Former Employees’ motion papers is unsigned. In a reply brief, the Derivative Claimants have represented “Open-Risk never counter-signed the Prior Inventions Agreement indicating that Mathai’s list of inventions was accepted, and does not accept, and vigorously disputes, Mathai’s self-serving (and incredibly broad) list of inventions set forth on his Prior Inventions Agreement.” I am not, on a motion to dismiss, in a position to determine whether Mr. Aylward (or anyone else) signed the agreement for OpenRisk, but if he did, it was evidently in a representative capacity.

 See preceding section and footnote 18.

 See Lee v. Mr. Ivy Press, L.P., 63 Mass.App.Ct. 538, 553 n.29 (2005) (declining to reach the issue in a civil case). In the criminal context, see, e.g., Commonwealth v. Engleman, 336 Mass. 66, 68-69 (1958); “trade secrets . . . are not the subject of larceny”; citing G.L.c. 266, §30(2)); Commonwealth v. Geane, 51 Mass.App.Ct. 149, 154 (2001) (“in order to be convicted for larceny, some tangible res must be converted”); Commonwealth v. Rizzuto, 1980 WL 4637 (Mass.Super. 1980; Zobel, J.) (defendant’s receipt of “intangible intellectual or literary property” in the form of illegally copied movies did not constitute receiving of stolen goods). Inasmuch as the criminal cases depend on a particular statutory definition of “property,” their application to a civil action for the common-law tort of conversion is uncertain.
Of course, intellectual property almost always resides on or within a tangible item of some sort — a piece(s) of paper, a book, film, a computer storage device, or some other medium on which ideas and their expression may be stored, accessed, and transferred. Those cases which have ruled the tort of conversion inapplicable to intellectual property have nonetheless, on appropriate facts, conceded its applicability to the “property’s” tangible incarnations. See, e.g., John G. Danielson, 186 F.Sup.2d at 29 (architectural drawings); see Export Lobster at n. 16 (“While Bay State possesses the names of Mantia’s former customers in Italy, there has been no showing that Bay State continues to possess the actual ‘customer lists,’ which would be the personalty at issue in a claim for conversion”).