SUPERIOR COURT 
 
 MOSHE YANAI, RACHEL YANAI, AND MICHAL INTERNATIONAL INVESTMENT LLC v. ZACK KEINAN, INDIVIDUALLY AND AS GENERAL PARTNER OF SCINTILLA HOLDINGS, LTD.; SCINTILLA HOLDINGS, LTD., AS GENERAL PARTNER OF SCINTILLA FUND, L.P.; AND BOAZ TOSHAV

 
 Docket:
 2584CV00565-BLS2
 
 
 Dates:
 March 20, 2025
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 SUFFOLK
 

 
 Keywords:
 DECISION AND ORDER ON PLAINTIFFS’ MOTION FOR A PRELIMINARY INJUNCTION AND THE MOTION TO STRIKE PLAINTIFFS’ REPLY MEMORANDUM AND DECLARATIONS
 
 

 Moshe and Rachel Yanai pledged their membership interests in Michal International Investment LLC (“MII”) as security for loans by Scintilla Fund, L.P. The outstanding balance is roughly $33 million. The Fund (acting through Zack Keinan, who is the general partner of the Fund’s general partner) contends that there have been “Events of Default” that entitle it to take control of and to sell MII. It removed Moshe Yanai as Manager of MII and replaced him with Boaz Toshav. The Fund plans to conduct a public sale of MII at the end of this month. The Yanais seek a preliminary injunction barring the Defendants from acting on behalf of MII or the Yanais, or purporting to do so, and barring the planned sale of the Yanais’ ownership interests in MII.
The Court concludes that the claims that give rise to the motion for preliminary injunction are properly before it. The Court will resolve the questions as to service of process by retroactively authorizing the service that succeeded in giving all defendants actual notice of this lawsuit. The Court also concludes that it may exercise personal jurisdiction over the defendants; the claims relevant here need not be brought in Israel; no choice of law issues need be decided at this time; the Yanais, as the sole members of the LLC, may bring suit on behalf of and in the name of MII; and the SPV Guarantor is not a necessary party. The Court will also exercise its discretion to deny the motion by Keinan and the Fund to strike plaintiffs’ reply memorandum and declarations.
As to the merits, the Court will deny Plaintiffs’ motion in part to the extent that it seeks to bar the Fund from acting on behalf of MII or as attorney-in-fact (for limited purposes) of the Yanais, or to bar Toshav from acting as MII’s Manager. The Yanais are not likely to succeed in proving that the Fund’s
 
                                                            -1-
 
exercise of the Yanais’ voting rights as Members of MII, its removal of Moshe Yanai as Manager of MII, or its appointment of Boaz Toshav as successor manager was unlawful. The record shows that the Yanais and MII failed to disclose a material breach that was therefore not conditionally waived by the Fund and that, in any case, they also committed additional material breaches constitute and revived other Events of Default. The Fund therefore was and is entitled to exercise its conditional right to take control of MII.
However, the Court will allow Plaintiffs’ motion in part to the extent that it seeks to bar, at least for now, any sale of the Yanais’ ownership interests in MII. The Yanais are very likely to succeed in proving that the planned sale of their ownership interest in MII next week would violate the Uniform Commercial Codee and the Pledge Agreements because the sale process undertaken by the Fund does not come close to being commercially reasonable. They are also likely to succeed in proving that the participation of Mr. Keinan and Mr. Toshav in this planned sale constitutes tortious interference with the Yanais’ rights under the Pledge Agreements. In addition, the Yanais would suffer irreparable harm from such a sale, and the balance of harms favors the granting of preliminary relief, and the Court concludes that there is good cause to issue a preliminary injunction without requiring Plaintiffs to post any bond.
Though the Court is enjoining Defendants from carrying out the planned sale of MII membership interests, Defendants may seek reconsideration if they take the time and make the effort to plan a commercially reasonable sale. Seeking reconsideration would be appropriate if, and only if, Defendants have a good faith basis to believe that they can show there has been a material change in circumstances and can demonstrate that a revised sale plan would be commercially reasonable.[1]
In the meantime, the parties have a further opportunity to agree upon—and this time fully implement—an alternative resolution of their dispute.
The record shows that both sides in this case have been behaving badly.
On the one hand, MII and Moshe Yanai committed flagrant breaches of their obligations under a June 2023 Side Letter to pay to the Fund the full proceeds received by MII from its subsequent sales of shares in eToro Group Ltd.
 
--------------------------------------------
[1] Cf. Blake v. Hometown Am. Communities, Inc., 486 Mass. 268, 278 (2020) (“if there is no material change in circumstances, a judge is not obliged to reconsider a case, issue, or question of law after it has been decided”) (quoting Littles v. Commissioner of Correction, 444 Mass. 871, 878 (2005)).
 
                                                            -2-
 
According to Plaintiffs’ verified complaint, MII instead used those funds to provide additional capital to its portfolio companies, despite is unambiguous promise and contractual obligation to pay them in full to the Fund. In addition, MII and Yanai also committed seemingly undisputed additional breaches of other material terms of the December 2024 Omnibus Agreement and Waiver. As a result, the Fund had the contractual right to step in and exercise the Yanais’ voting rights as Members of MII.
On the other hand, Defendants have not come close to making commercially reasonable efforts to sell the Yanais’ membership interests in MII. Plaintiffs’ argument that the current sale process and terms seem designed to ensure that the Fund will be the only bidder for MII appears to be well founded. The current record strongly suggests that Defendants are merely going through the motions of conducting a public sale, with the expectation that their lackluster and lackadaisical efforts will not elicit any bidders to compete with the Fund in bidding to purchase MII. That is wholly improper and unacceptable.
The Court urges the parties to work cooperatively to negotiate and quickly implement a business solution that ensures the Fund will promptly be paid in full. In the meantime, the Court will enter a preliminary injunction to ensure that the Fund does not purchase or otherwise dispose of the Yanais’ membership interests in MII through a process and on terms that are the antithesis of commercial reasonableness.
1. Factual Background. The Court finds that the verified complaint and declarations submitted to date establish the following.
1.1. MII’s Business. Moshe Yanai and Rachel Yanai each own 50 percent of MII, which is in the business of investing in non-public operating companies. The verified complaint states that “MII is a privately held Massachusetts entity whose only activity is the ownership of securities issued by privately held Israeli high-tech enterprises.”[2] MII is a Massachusetts limited liability company that does business in Brookline, Massachusetts.
Moshe Yanai had always been the Managing Member of MII, until he was removed from that position by the Fund earlier this year, as discussed below.
 
--------------------------------------------
 
[2] The Yanais are bound by this allegation, and by the other factual allegations in their verified complaint. See G.L. c. 231, § 87 (“In any civil action pleadings … shall bind the party marking them.”); Adiletto v. Brockton Cut Sole Corp., 322 Mass. 110, 112 (1947) (this statute provides that “facts admitted in pleadings” are “conclusive upon” the party making them).
 
                                                            -3-
 
The Yanais are dual citizens of the United States and Israel, previously lived in Brookline, and now reside in Tel Aviv-Jaffa.
The Yanais allege that, as of the end of 2024, MII had ownership interests in  16 companies. They contend that MII invested over $222 million in these business, and that these investments are now worth in excess of $1.1 billion; the Yanais have not explained or documented their valuation of those investments. MII’s largest investment (roughly $51.5 million) is in Infinidat, Ltd., which has annual sales of around $250 million. In mid-January 2025, Lenovo announced that it is acquiring Infinidat; the announcement noted that Infinidat had been valued at $1.6 billion in 2017.
1.2. The Loans, Pledges of Security, and Other Agreements. The key terms of the borrower/lender relationship between MII and the Fund can be summarized as follows.
1.2.1. Facility Agreements, Amounts Borrowed, and Amounts Owed. From 2019 through 2023, the Fund made loans to MII totaling $38.2 million. Each of these loans was made pursuant to a detailed “Facility Agreement.” Zack Keinan signed each of the Facility Agreements on the Funds behalf, in his capacity as General Partner of Scintilla Holdings Ltd., which is the General Partner of the Fund. These contracts state that the Fund was agreeing to loan specified amounts to MII, and that MII’s registered office was in Brookline, Massachusetts.
The Fund loaned MII a total of $15 million under the original Facility Agreement, an additional $5 million in February 2023 under a second such Agreement, and a final loan of $18,208,316 in August 2023 under a third such Agreement (for a total of $38.2 million).[3] Moshe Yanai personally guaranteed repayment of all these loans.
MII belatedly repaid $6 million in principal during February and March 2024, and also made timely interest payments for a while.[4] As a result, as of December  2024  MII  owed  outstanding  principal  totaling  $32,208,316  (the
 
--------------------------------------------
 
[3] MII agreed to pre-pay all interest on this loan through the original maturity date, by having the Fund withhold $4,708,316 in interest from the total loan amount. As a result, although in August 2023 MII borrowed an additional $18.2 million, it received only $13.5 million from the Fund. See § 7.2 of the August 2023 Facility Agreement.
[4] The Fund, MII, and Moshe Yanai confirmed these payments in their July 2024 “Waiver Agreement,” discussed below.
 
                                                            -4-
 
original $38.2 million in loans minus the $6 million that has been repaid), plus interest of more than $574,857.[5]
The Facility Agreements contain a “mandatory prepayment on disposal” clause that requires MII to notify the Fund in writing immediately upon any sale or other disposal of any equity interest in any of MII’s portfolio companies or other assets. The clause gives the Fund the right, within five business days of receiving such a notice, to decide whether to require prepayment of part or all of the outstanding Loan, and if so to give notice in writing that it is requiring at least partial repayment. If the Fund opts to require any prepayment, then the clause requires MII to notify the Fund in writing upon receiving proceeds from the sale or other disposal, and to prepay the Loan in the amount that the Fund had specified.[6]
Each Facility Agreement provides that it is governed by the laws of the State of Israel, and that courts in Tel Aviv-Jaffa, Israel, shall have exclusive jurisdiction to hear and determine any claim by MII arising out of or in connection with the Facility Agreement. The forum selection clause states that it is for the benefit of the Fund, and that the Fund is free to bring suits concerning or to enforce the Facility Agreements elsewhere.
1.2.2. June 2023 Side Letter. The Fund, MII, and Moshe Yanai entered into a “Side Letter” agreement in late June 2023 that supplemented and modified the February 2023 Facility Agreement.
This Side Letter provided in part that, notwithstanding the provisions of the “mandatory prepayment on disposal” clause of the Facility Agreements, going forward MII was required to apply the “full proceeds of any sale” of shares in
 
--------------------------------------------
 
[5] The Fund, MII, and Moshe Yanai agreed to these figures in their December 2024 “Omnibus Agreement and Waiver,” discussed below. This interest figure is based on the original interest rates, and does not include additional interest that MII agreed to pay under the Omnibus Agreement.
[6] Under Massachusetts law, since the Facility Agreements required that all such notices must be provided “in writing,” actual notice by some other means would not be effective or sufficient. See TAL Financial Corp. v. CSC Consulting, Inc., 446 Mass. 422, 428 (2006); see also Sargent v. Koulisas, 29 Mass. App. Ct. 956, 958 (1990) (lender not entitled to accelerate amounts due where note required notice of default in writing, and lender presented no evidence of having given written notice). For the reasons discussed below in § 2.4 of this decision, the Court need not determine (at least at this time) whether Israeli law differs.
 
                                                            -5-
 
eToro Group Ltd. toward prepayment of the amounts that MII owed to the Fund. This provision had the effect, solely with respect to proceeds from the sales of eToro shares, of eliminating the Facility Agreements’ condition that the Fund would be entitled to partial prepayment of the loan balances only if it gave timely written notice that it was requiring such prepayment. Instead, by entering into the Side Letter, MII and Yanai agreed that going forward all proceeds from future sales of eToro stock would be paid to the Fund without the Fund having to provide any further notice.
In addition, the Side Letter required that Moshe and Rachel Yanai would enter into a separate “Massachusetts law security agreement” pledging their membership interests in MII as security for the loans.
Finally, the Side Letter also provided that the February 2023 Facility Agreement and the Side Letter “shall be read and construed as one instrument,” and that the Side Letter shall constitute a “Finance Document” within the meaning of that Facility Agreement.
As a result, any breach of the Side Letter would constitute an “Event of Default” under § 14.1 of the February 2023 Facility Agreement.
1.2.3. Pledge Agreements. As required by the Side Letter, the Yanais executed two Pledge Agreements during 2023. The first such agreement pledged the Yanais’ membership interests in MII as security for the first $20 million that the Fund loaned to MII. The second such agreement made a similar pledge with respect to the last $18.2 million loan made by the Fund in August 2023.
The Court infers and therefore finds that the form of the Pledge Agreements was negotiated and agreed to by the Fund.
The Pledge Agreements state that they are creating a security interest in favor of the Fund in the Yanais’ MII membership interests and in all proceeds payable to the Yanais with respect to those interests, to function as collateral security for all amounts owed by MII under the Facility Agreements.
These Pledge Agreements stipulate that MII’s registered office is in Brookline, Massachusetts (at the Yanais’ home) and provide that the Pledges are governed by Massachusetts law, that the Fund may bring suit to enforce these Pledges in Massachusetts (or in any other appropriate jurisdiction), and that any documents used to start a proceeding in relation to either Pledge may be served by delivering them to MII at its registered office in Massachusetts.
 
                                                            -6-
 
The Pledge Agreements provide that if there is an Event of Default under the Facility Agreement then:
o          the Yanais’ “voting and other consensual rights” as Members of MII will become “vested in” the Fund, which will “then have the sole right to exercise” such rights;
o          all rights to receive dividends, distributions, or interest payments from MII will also become “vested in” the Fund, and any such payments that are nonetheless received by the Yanais shall promptly be paid over to the Fund;
o          the Fund, as well as its designees or agents, shall automatically become the Yanais’ attorney-in-fact with fully authority to take legal actions with respect to their membership interests in MII; and
o          the Fund may sell or otherwise dispose of the Yanais’ membership interests in MII at public or private sale, on commercially reasonable terms, and retain from the sale proceeds an amount sufficient to pay off the full amount owed by the Funds.
By specifying that they are governed by Massachusetts law, the Pledge Agreements incorporate the UCC requirement in G.L. c. 106, § 9-610(b) that any sale or other disposition by the Fund of the Yanais’ membership interests in MII must be commercially reasonable in all respects.
Unlike the Side Letter or the later Omnibus Agreement (discussed below), the Pledge Agreements do not say that they should be construed together with each Facility Agreement as one document, or that the Pledge Agreements constitute a “Finance Document” within the meaning of the Facility Agreements. Also, unlike the Omnibus Agreement, the Pledge Agreements do not incorporate the forum selection provisions of the Facility Agreements.
1.2.4. July 2024 Waiver Agreement. The original maturity date for the first $20 million loan was December 31, 2023. MII failed to pay of that loan amount by that date, which was an Event of Default under the governing Facility Agreements.
In February and March 2024, MII made three principal payments totaling $6 million, leaving a balance of $14 million due on the original loans.
In July 2024, the Fund, MII, and Moshe Yanai entered into a written “Waiver Agreement” in which the Fund temporarily waived repayment of this
 
                                                            -7-
 
outstanding balance, subject to the conditions that MII pay an additional $1.5 million by July 31, 2024, an additional $5 million by August 2, 2024, and the final $7.5 million by December 31, 2024.
This Waiver allowed MII to miss the first two payment deadlines, but provided that if that happened then MII would automatically grant to the Fund "phantom equity" that could later be redeemed in cash. But the Waiver provided that if the $14 million principal balance on the original loan were not repaid in full by December 31, 2024, that would constitute an immediate Event of Default.
1.2.5. Breaches by MII in the Fall of 2024. Soon after the parties executed the July 2024 waiver agreement, MII committed additional, material breaches of its contractual obligations.
First, MII failed to pay to the Fund the proceeds that MII received from selling eToro stock in September 2024, as expressly required in the Side Letter.[7]
On September 18, 2024, Moshe Yanai gave written notice to the Fund (via WhatsApp) that MII had sold additional eToro shares the day before. MII received $5.073 million from that sale; its net receipts after deducting brokerage fees and taxes was around $3 million.
Keinan immediately reminded Yanai in writing that MII was obligated to use all of the proceeds from this eToro sale to repay debt owed to the Fund, and may not use the proceeds for any other purpose. In so doing, Keinan correctly summarized MII’s obligations under paragraph 1 of the Side Letter. Keinan demanded in writing that MII transfer the entire proceeds from this sale to the Fund within the next several days.
Yanai refused to pay any portion of the eToro sale proceeds to the Fund. This constituted a breach of the Side Letter and an Event of Default under the February 2023 Facility Agreement.
Second, MII then failed to make a regularly scheduled interest payment that was due on October 1, 2024. This constituted an Event of Default under all of the Facility Agreements.
 
--------------------------------------------
 
[7] The Verified Complaint indicates that MII also sold shares of eToro stock in  June 2024 without paying the proceeds to the Fund. It appears that constituted an additional breach of the Side Letter, though the Fund does not address it in opposing Plaintiff’s motion for a preliminary injunction.
 
                                                            -8-
 
1.2.6. December 2024 Omnibus Agreement. In December 2024, Moshe Yanai told Keinan that he would not be able to make the $14 million principal payment that was due on December 31, 2024, and asked for an extension to give him time to negotiate and close on a refinancing transaction with Goldman Sachs that would permit MII to repay the Fund in full. Yanai also informed Keinan that he planned to sell more eToro shares, but that MII would not receive any proceeds from that sale until February 2025.
The Fund, Yanai, MII, and an MII affiliate (Michal ETR International Israel 2 Ltd., which the parties called the “SPV Guarantor”) ultimately entered into an “Omnibus Agreement and Waiver” effective December 31, 2024.
In this Omnibus Agreement, MII and Yanai acknowledged that “certain Events of Default have occurred under the Facility Agreements.” The Fund nonetheless agreed to extend the maturity date under all of the Facility Agreements to June 30, 2025.
The Fund also agreed to a “conditional waiver” of any Events of Default “known to” the Fund as of December 31, 2024. The Omnibus Agreement made clear that the conditional waiver did not apply to any existing Events of Default that the Fund was not aware of, or to any future default or breach.
This contract provided that the conditional waiver of prior, known Events of Default would be “null and void” if the Fund, Yanai, or the SPV Guarantor failed to comply with any requirement of the Omnibus Agreement. It also provided that any breach of the Omnibus Agreement would “constitute an immediate Event of Default under each Facility Agreement.”
The new requirements that MII, Yanai, and the SPV Guarantor accepted in the Omnibus Agreement included the following.
o          Sections 4(a) and 4(c) increased the annual interest rate for each Loan outstanding to 23 percent.[8]
o          Section 7(b)(ii) required MII to procure a pledge by MII Aviation Services LLC of its membership interests in Boston Executive Helicopters LLC, and to do so by January 7, 2025.
 
--------------------------------------------
 
[8] The Court can resolve the pending motion for preliminary injunctive relief without deciding whether the Massachusetts usury statute applies and makes it unlawful for the Fund to collect more than 20 percent annual interest.
 
                                                            -9-
 
o          Section 8(a) provided that MII could sell any part of its equity interest in eToro at any time, but required MII to provide timely notice of any such sale and to use “all proceeds of such sale in and towards the prepayment of the Loans.” Just like the similar provision in the Side Letter, this section of the Omnibus Agreement had the effect, solely with respect to proceeds from the sales of eToro shares, of eliminating the Facility Agreements’ condition that the Fund would be entitled to partial prepayment only if it gave timely written notice that it was requiring such prepayment.
o          Section 9.2(a) required MII to provide the Fund with a detailed report of MII’s assets and liabilities by December 31, 2024.
o          Section 10.3(a) required MII to provide notice by January 8, 2025, to three of the portfolio companies in which MII had invested (Infinidat, Arineta Ltd., and eToro9) instructing them not to sell or dispose of any equity interest held by MII without prior written consent of Fund.
o          Section 10.3(b) required that, by January 31, 2025, MII and the SPV Guarantor had to implement a ring-fencing requirement ttat was originally imposed in § 14.18 of the August 2023 Facility Agreement, but have never been implemented by MII and its SPV Guarantor. To comply with this provision, MII was required to transfer its shares in Infinidat, as well as MII’s $23.355 million loan to Infinidat, from MII to the SPV Guarantor; the SPV Guarantor was required to hold those assets as security for the Fund.
The Omnibus Agreement provided that the prior Facility Agreements “shall continue in full force and effect,” and that they and the Omnibus Agreement “shall be read and construed as one instrument.” It also provided that the Omnibus Agreement shall constitute a “Finance Document” within the meaning of that Facility Agreements.
In addition, the Omnibus Agreement provided in § 13.1 that the “Governing Law and Enforcement” section of the Facility Agreements are incorporated by reference into the Omnibus Agreement. This means that, like the Facility Agreements, the Omnibus Agreement is also governed by the laws of the State of Israel, and that courts in Tel Aviv-Jaffa, Israel, shall have exclusive
 
--------------------------------------------
 
[9]        Infinidat and Arineta were MII’s largest and most valuable investments.
 
                                                            -10-
 
jurisdiction to hear and determine any claim by MII arising out of or in connection with the Omnibus Agreement.
1.3. Subsequent and Undisclosed Breaches. MII, Moshe Yanai, and the SPV Guarantor quickly breached the requirements of the Omnibus Agreement.
First, MII failed to provide the Fund with a detailed report of MII’s assets and liabilities by December 31, 2024, or thereafter.
Second, MII did not procure the required pledge by MII Aviation Services LLC of its subsidiary, Boston Helicopters, by January 7, 2025, or thereafter.
Third, MII failed to provide the required notice and instructions to three of its portfolio companies not to dispose of any equity interest held by MII without the Fund’s permission. This notice was not provided by the January 8, 2025, deadline or thereafter.
Fourth, MII and the SPV Guarantor never implemented the ring-fencing requirement described above. They did not do so by the January 31, 2025, deadline or thereafter.
In addition to these further breaches, it turns out that MII had also kept hidden a prior breach of the Side Letter, which therefore was not covered by the conditional waiver in the Omnibus Agreement. The Fund learned for the first time on January 12, 2025, that MII had received proceeds from an additional sale of eToro shares three weeks earlier, on December 21, 2024. The gross proceeds from that sale were $9.84 million. MII was obligated under the Side Letter to pay the entire proceeds to the Fund. But it did not do so.
The Court credits Keinan’s sworn testimony (in his declaration) that, though Yanai told Keinan in December 2024 he planned to sell more shares of eToro, Yanai led Keinan to believe that MII would not receive any proceeds until February 2025, and failed to inform the Fund before the Omnibus Agreement was executed that MII actually received proceeds from this sale in December. As a result, the Fund did not know when it executed the Omnibus Agreement that MII had breached the Side Letter days earlier by selling eToro shares and using the proceeds for other purposes rather than paying them all to the Fund. The conditional waiver provision in the Omnibus Agreement applied only to Events of Default known to MII at the time it executed that contract, not to other Events of Default that Yanai kept hidden from the Fund.
1.4. The Fund Seizes Control of MII. On January 27, 2025, counsel for the Fund gave notice to MII and to Moshe Yanai that they had breached the Facility
 
                                                            -11-
 
Agreements and Omnibus Agreement by selling shares in eToro without paying over all proceeds to the Fund. This letter also informed MII and Yanai that they had breached the Omnibus Agreement by failing to report on MII’s assets and liabilities, failing to provide the required notice to three of MII’s portfolio companies, failing to implement the ring-fencing provision (even though the deadline for doing so was not for another four days), and failing to provide a pledge of membership interests in Boston Helicopters.
This letter stated that as a result the conditional waiver of prior Events of Default was null and void, MII had committed multiple Events of Default of the various Facility Agreements, and the Fund therefore was entitled to accelerate the loans, enforce the Fund’s security rights, and also enforce Moshe Yanai’s personal guarantees.
The next day, Keinan gave notice to the Yanais and to MII that the Yanai’s voting and consensual rights as Members of MII had ceased, and that the Fund was exercising its power as the Yanais’ attorney-in-fact under the Pledge Agreements to exercise those rights. The letter also said that the Fund had exercised those rights, through a written consent, to remove Moshe Yanai as Manager of MII and to appoint Boaz Toshav as the sole Manager of MII.
On January 29, 2025, Toshav wrote to MII’s bankers to inform them that Yanai was no longer the Manager of MII, Toshav was the new Manager, and the bank may no longer accept or act upon any instructions from the Yanais with respect to MII’s account. Toshav also asked the bank to provide all available bank statements, records, and information for or about MII’s account.
One day later, counsel for the Fund sent an acceleration notice informing the Yanais and MII that all amounts owed for the loans under the Facility Agreements were “immediately due and payable.”
On February 4, 2025, the Fund (exercising the Yanais’ voting rights as Members of MII) and Toshav (in his capacity as the new Manager of MII) gave written consent to amend MII’s Operating Agreement and to amend its Certificate of Organization to indicate that Toshav was now the Manager. Toshav signed the Certificate of Amendment and caused it to be filed with the Massachusetts Secretary of State.
The next day, Toshav caused MII to notify the Massachusetts Secretary of State that Moshe Yanai was no longer resident agent of MII, the address for MII’s registered agent was no longer at the Yanais’ Brookline home, and SPI Agent
 
                                                            -12-
 
Solutions, Inc., is the new registered agent and will be using a mailing address in Woburn, Massachusetts.
On February 6, 2025, Toshav wrote to MII’s auditor in Boston, Massachusetts, asking for copies of all financial information and records that the auditor had for MII. Toshav also informed the auditor that Moshe Yanai had been removed as Manager, Toshav is the new Manager, and the auditor may no longer take any direction from Moshe Yanai with respect to MII.
On February 11, 2025, Keinan (acting as General Partner of the Fund) sent a foreclosure notice informing the Yanais that the Fund plans to sell the Yanais’ ownership interests on March 27, 2025.
1.5. Sale Notices and Terms. The Fund has now publicly announced that it plans to conduct a public sale of the Yanais’ membership interest in MII on March 27, 2025. As noted above, together the Yanais own 100 percent of MII.
The value of MII lies in its ownership interests in 16 portfolio companies. The verified complaint establishes that this portfolio consists of investments in:
o          the technology companies Infinidat (an Israeli company that sells enterprise data storage systems), KoolSpan (a Delaware company that provides cyber security for cellphones), Maradin (an Israeli company that sells MEMS-based laser scanning for smart glasses), Bubble Workspace (an Israeli company that provides cyber protection for enterprises), and Cortica (an Israeli company in the cyber software business);
o          the medical companies Arineta (an Israeli company that sells cardiovascular CT scanners), Quris (an Israeli drug development company), Vimodo (an Israeli company that develops bioinformatics cancer drugs), Renew Medical (a Delaware medical devices company), Sight Diagnostics (an Israeli medical diagnostics company), and Laminate (an Israeli medical devices company);
o          the investment companies Rainbow Medical Ltd. (a medical investment fund based in Israel), as well as MoreTech and ION Crossover Partners (which are venture capital funds that apparently invest in Israeli technology companies);
o          the financial services company eToro (which operates a social network for stock trades); and
 
                                                            -13-
 
o          the aviation company MII Aviation Services (which provides services as a fixed-base operator at airports in Massachusetts and Israel, and charter helicopter services in Massachusetts).
As noted above, Plaintiffs contend that MII’s investment portfolio is worth more than $1 billion.
The only steps that the Fund has taken to publicize in its sale of MII were to publish a “Notice of Public Sale” in the national print edition of The Wall Street Journal on February 18, and March 4, 2024. These notices, which were in tiny print, say that the Fund will be selling 100 percent of the membership interests in Michal International Investment LLC to the highest bidder, and that the sale will take place on March 27, 2025, at 10:00 a.m. at the law offices of Chapman and Cutler in New York City. There is no evidence that Defendants have done anything other than run these two advertisements to elicit any interest in purchasing MII.
These public sale notices provide no information about MII and do not refer to any of its investments in any of the portfolio companies. Instead, the notices state that information about MII will be provided only “to prospective bidders who execute a non-disclosure agreement” (or NDA). The notices state that to qualify as a bidder an interested party must provide “reasonable proof of financial ability and their proposed bid amounts no later than five (5) business days prior to the Public Sale.” In other words, even though the public sale date has been set for March 27, bidders must submit their bids and financial qualifications by March 20, which is today.
The public sale notices also state that the Fund has reserved the right to “bid all or a portion of its claim at the Public Sale without cash, certified check or cashier’s check as required of other bidders,” to “alter the terms of payment” without notice, to “elect not to dispose of certain Sale Assets” without notice, to “reject all bids,” and to announce additional terms of sale at the time of the Public Sale.
Despite these caveats, the public sale notices require that any successful budder must pay the entire purchase price to the Fund by noon on the first business day after the acceptance of the bid, and in return the winning bidder “will receive a secured party bill of sale with no representations or warranties of any kind or nature whatsoever.”
 
                                                            -14-
 
Defendants have presented no evidence that anyone contacted the Fund expressing the least bit of interest in participating in this bid process, that any prospective bidder executed an NDA and obtained more information about MII from the Fund, or that anyone has submitted a bid.
2. Gatekeeping Issues. Defendants raise a slew of reasons why, in their view, the Court should deny the motion for a preliminary injunction without ever reaching the merits. The Court does not find these arguments to be persuasive.
2.1. Service of Process. Defendants’ assertion that they should not have to respond to the preliminary injunction motion because they never received effective service of process is not persuasive.
The Fund, it general partner Scintilla Holdings, Ltd., Mr. Keinan, and Mr. Toshav all received actual notice of this lawsuit together with copies of the summonses issued to them and all papers initially filed by the Plaintiffs. All of the Defendants filed detailed oppositions to the preliminary injunction motion. They also all appeared and argued against that motion at the recent hearing.
Defendants nonetheless insist that the Court cannot even begin to consider the request for preliminary injunctive relief until service of process has been completed in a manner specified in Mass. R. Civ. P. 4(e). Since Defendants all received actual notice, the Court will exercise its discretion not to permit them to impose an unnecessary burden on the plaintiffs to achieve formal compliance with the default service-of-process rules.
The Court recognizes that “acquisition of personal jurisdiction over a defendant cannot be satisfied without proper service of process or an appropriate substitute” (emphasis added). Uzoma v. Okereke, 88 Mass. App. Ct. 330, 331 (2015), quoting Wang v. Niakaros, 67 Mass. App. Ct. 166, 172 (2006).
But Massachusetts law gives the Court broad power and discretion to authorize an alternative means of serving process outside the Commonwealth, so long as it is reasonably calculated to give a defendant actual notice that they have been sued. See G.L. c. 223, § 6(a)(5); Mass. R. Civ. P. 4(e)(5). The methods for service of process listed in Rule 4 are intended to ensure that a defendant has been put on notice of the claims against them. Where some other method is likely to achieve the same result—or, as in this case, has already achieved the same result—the Court may allow it to be used.
Plaintiffs’ efforts to serve Defendants—by leaving copies at Keinan’s last known residence in Tel Aviv-Jaffa Israel and at Toshav’s business office in
 
                                                            -15-
 
London, England, as well as by emailing and overnighting electronic and paper copies to Keinan, Toshav, and attorneys for the Fund and Scintilla Holdings— succeeded in providing all Defendants with actual notice of the claims and motion against them.
The Court concludes that it will further the interests of justice to order that the manner in which Plaintiffs have already delivered process to the Defendants was valid and authorized retroactively (or “nunc pro tunc” in legal Latin) to February 28, 2025, which is the date that Plaintiffs filed this action. Cf. Marks v. Alfa Group, 615 F.Supp.2d 375, 380 (E.D. Pa. 2009) (reaching same result under Fed. R. Civ. P. 4(f)(3)).
The Court has the power to enter an order authorizing a particular method for serving process outside the Commonwealth nunc pro tunc to an earlier date. See generally Almeida Bus Lines, Inc. v. Department of Pub. Utils., 348 Mass. 331, 337 (1965) (“The Supreme Judicial and the Superior courts have statutory power,” as well as inherent common law power, “to issue judgments, orders, and decrees nunc pro tunc.”); Diggs v. Diggs, 291 Mass. 399, 400 (1935) (“Courts have inherent powers in appropriate cases to make entries nunc pro tunc”);
G.L. c. 235, § 4 (court may provide that any “judgment or order” shall take effect as if “entered as of an earlier day”).
A nunc pro tunc order may appropriately be used, as in this case, to “validate some proceeding” or course of conduct that was “actually taken” but not previously authorized. Almeida Bus Lines, 348 Mass. at 337-338, quoting Perkins v. Perkins, 225 Mass. 392, 396 (1917). Indeed, under some circumstances a nunc pro tunc order may even be used to cure a defect of subject matter jurisdiction by retroactively giving a court the power to act. See St. Joseph’s Polish National Catholic Church v. Lawn Care Assocs., Inc., 414 Mass. 1003, 1004 (1993) (rescript) (although Housing Court judge lacked jurisdiction to decide breach of contract, negligence, and G.L. c. 93A claims, defect was cured by order after judgment entered, but effective nunc pro tunc to beginning of case, that transferred case to Superior Court and designating judge as a Superior Court justice). If a judge’s power to exercise subject matter jurisdiction in a particular case may be cured retroactively, then the same must be true about a court’s power to exercise personal jurisdiction over particular defendants.
The Court exercises its discretion to order nunc pro tunc that the actual manner in which Plaintiffs provided service of process to the Defendants was authorized and thus lawful and effective.
 
                                                            -16-
 
2.2. Personal Jurisdiction. Defendants’ further objections to the exercise of personal jurisdiction over them are also unavailing. The Court concludes that it may exercise personal jurisdiction over the Defendants, at least with respect to the claims that the Fund’s planned sale of the Yanais’ membership interests in MII is not commercially reasonable, would therefore violate the Uniform Commercial Code and the Yanais’ Pledge Agreements, and would constitute tortious interference by improper means with those Pledge Agreements.
2.2.1. Jurisdiction over the Fund. The Massachusetts long-arm statute authorizes specific jurisdiction as to a cause of action arising from the transaction of business in Massachusetts by the defendant or its agent. See G.L. c. 223A, § 3(a).
“ ’The term ‘transacting business' is broadly construed,’ and ‘anything but the most incidental commercial contact’ is sufficient.” Cannonball Fund, Ltd. v. Dutchess Cap. Mgmt., LLC, 84 Mass. App. Ct. 75, 98 (2013), quoting Haddad v. Taylor, 32 Mass. App. Ct. 332, 335 (1992) (“broadly construed”), and Foster–Miller, Inc. v. Babcock & Wilcox Canada, 848 F.Supp. 271, 276 (D.Mass. 1994) (“most incidental commercial contact”), reversed on other grounds, 46 F.3d 138 (1st Cir. 1995); accord Tatro v. Manor Care, Inc., 416 Mass. 763, 767 (1994).
The “arising from” language in this statute creates a “but for” test. See Tatro, 416 Mass. at 770–771. “This means ‘a claim arises from a defendant's transaction of business in [Massachusetts] if the claim was made possible by, or lies in the wake of, the transaction of business in [this State].’ ” von Schonau-Riedweg v. Rothschild Bank AG, 95 Mass. App. Ct. 471, 490 (2019) (bracketed material in original), quoting Tatro, 416 Mass. at 771.
The Fund is subject to personal jurisdiction in Massachusetts because it transacted business here by loaning tens of millions of dollars over a period of years to a Massachusetts limited liability company that it knew was registered to do business in Brookline, Massachusetts, requiring the Yanais to pledge their membership interests in this Massachusetts LLC as collateral security for the those loans, amending the Massachusetts LLC’s articles of organization and certificate of organization, and exercising the Yanais’ voting rights as Members of MII to exercise pervasive control over this Massachusetts business entity. See Tatro, 416 Mass. at 767 (“purposeful and successful solicitation of business” from a Massachusetts business); Good Hope Industries, Inc. v. Ryder Scott Co., 378 Mass. 1, 10 (1979) (engaging in enterprise of “substantial dimension and duration” with party known to have business headquarters in Massachusetts);
 
                                                            -17-
 
Johnson v. Witkowski, 30 Mass. App. Ct. 697, 713 (1991) (signing document amending Massachusetts Trust).; Kleinerman v. Morse, 26 Mass. App. Ct. 819, 823 (1989) (parent corporation exercised “persistent and pervasive” control over subsidiary doing business in Massachusetts).
Furthermore, there is a sufficient nexus between these activities and Plaintiffs’ claims for breach of the Pledge Agreements and under the UCC. In other words, the claims relevant to the preliminary injunction motion arise from the Fund’s transaction of business in Massachusetts.
Turning to the constitutional requirements, Plaintiffs must prove three things to establish that the exercise of specific personal jurisdiction over the Fund would satisfy due process. First, jurisdiction must be based on contacts with Massachusetts by which the Fund “purposefully avail[ed] itself of the privilege of conducting activities” in Massachusetts, “thus invoking the benefits and protections of its laws.” Bulldog Inv'rs Gen. P'ship v. Secretary of the Commonwealth, 457 Mass. 210, 217 (2010), quoting Asahi Metal Indus. Co. v. Superior Court of California, Solano Cty., 480 U.S. 102, 109 (1987). “Second, the claim must arise out of, or relate to the defendant’s contacts with the forum.” Bulldog Inv’rs, supra. Third, “the assertion of jurisdiction over the defendant must not offend ‘traditional notions of fair play and substantial justice.’ ” Id., quoting Tatro, 416 Mass. at 773, quoting in turn International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). “ ‘The constitutional touchstone’ of the determination whether an exercise of personal jurisdiction comports with due process ‘remains whether the defendant established “minimum contacts” in the forum state.” Bulldog Inv’rs, supra, quoting Tatro, 416 Mass. at 772, quoting in turn Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985).
The Court concludes that all three parts of this test are satisfied here. First, as discussed above, the Fund conducted substantial business in Massachusetts and thereby purposefully availed itself of the privilege of conducting business here. “[P]arties who ‘reach out beyond one state and create continuing relationships and obligations with citizens of another state’ ” have established sufficient minimum contacts with the other State to be subject to personal jurisdiction there for claims related to the contract. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473 (1985), quoting Travelers Health Assn. v. Virginia, 339 U.S. 643, 647 (1950); accord Exxon Mobil Corp. v. Attorney General, 479 Mass. 312, 322 (2018). Second, the Yanais’ claims relate to the Fund’s contacts with Massachusetts by entering into and seeking to enforce the Pledge Agreement,
 
                                                            -18-
 
and by exercising pervasive control over MII. Finally, under these circumstances asserting jurisdiction over the Fund would be fair.
2.2.2. Jurisdiction over Keinan and Toshav. Just as the Fund’s exercise of pervasive control over MII constitutes the transaction of business in Massachusetts, so the direct involvement of Keinan and Toshav in the Fund’s control and operation of MII constitutes transacting business in Massachusetts that permits Massachusetts courts to exercise personal jurisdiction over them.
“Although jurisdiction over a corporation does not automatically secure jurisdiction over its officers, active entrepreneurial or managerial conduct in the State where jurisdiction is asserted will cause jurisdiction to attach” (internal citation omitted). Kleinerman, 26 Mass. App. Ct. at 824 (1989). Since Keinan and Toshav were the “principal actors” for the Fund as it exercised plenary control over MII, and all “major directives flowed” from them and “major controversies were bucked up to” them with respect to the continuing operation of MII, they are subject to personal jurisdiction because the claims against them arise from their transaction of business in Massachusetts. Id.
The exercise of personal jurisdiction over Keinan and Toshav is also constitutional, for the same reasons discussed as to the Fund in the prior section of this decision.
2.3. Proper Forum. Defendants argue that this lawsuit may not be brought in Massachusetts, but instead may only be filed in Israel, because the Facilities Agreements say so. The Court is not persuaded that the forum selection provision in the Facilities Agreements applies to Plaintiffs’ claims under or relating to enforcement of the Pledge Agreement.
As with any contract concerning a business venture, the Court must construe the Pledge Agreements in a manner that will give them “effect as a rational business instrument and … carry out the intent of the parties.” Robert and Ardis James Foundation v. Meyers, 474 Mass. 181, 188 (2016), quoting Starr v. Fordham, 420 Mass. 178, 192 (1995). In doing so, the Court must be “guided by ‘justice, common sense, and the probable intent of the parties.’ ” Robbins v. Krock,      73 Mass. App. Ct. 134, 139 (2008), quoting Fried v. Fried, 5 Mass.  App. Ct. 660, 664 (1977); accord, e.g., Krapf v. Krapf, 439 Mass. 97, 105 (2003); City of Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 720 (1999).
What matters here is how the Pledge Agreements differ from the other agreements relating to the business relationship between the Fund and MII.
                                                            -19-
 
As noted above, each Facility Agreement provides that courts in Tel Aviv-Jaffa, Israel, shall have exclusive jurisdiction to hear and determine any claim by MII arising out of or in connection with the Facility Agreement.
The June 2023 Side Letter did not include a separate forum selection clause. Instead, the parties agreed that the Side Letter and the February 2023 Facility Agreement “shall be read and construed as one instrument,” which means that the forum selection clause in that Facility Agreement governs and applies to the Side Letter.
The December 2024 Omnibus Agreement similarly provided that it and the prior Facility Agreements “shall be read and construed as one instrument.” In addition, as a sort of belt-and-suspenders drafting, the Omnibus Agreement expressly incorporated the choice of law and forum selection provisions of the Facility Agreements.
In marked contrast, the Pledge Agreements do not state that they and the Facility Agreements shall be read and construed as one instrument. Nor do they otherwise incorporate the choice of law and forum selection provisions of the Facility Agreements. Instead, the Pledge Agreements include a separate “governing law” section which provides that they shall be governed by Massachusetts law (not Israeli law) and includes a permissive forum selection provision stating that the Yanais consent to the Fund bringing any action to enforce these contracts in any court in Massachusetts.
If the Fund and the Yanais intended for the Pledge Agreements to be governed by the Israeli forum selection clauses of the Facilities Agreements then they would have said so, as they did implicitly in the Side Letter (by requiring that it and the most recent Facility Agreement be construed as one instrument) and as they did explicitly in the Omnibus Agreement. The choice not to incorporate the Facility Agreements’ mandatory forum selection clause into the Pledge Agreements reflects a clear intent by the Fund and the Yanais not to require that lawsuits concerning the Pledge Agreements be brought in Israel.
The Court may not read into the Pledge Agreements a different forum selection provision that the parties could have adopted but chose not to include. See Automile Holdings, LLC v. McGovern, 483 Mass. 797, 817 (2020) (“We cannot rewrite the contract to cure an oversight or relieve a party from the consequences of the failure to adhere to its plain terms.”) (quoting National Med. Care, Inc. v. Zigelbaum, 18 Mass. App. Ct. 570, 575–576 (1984)); Acushnet Company v. Beam, Inc., 92 Mass. App. Ct. 687, 695 (2018) (“Courts may not by
 
                                                            -20-
 
construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.”) (quoting Vermont Teddy Bear Co. v. 438 Madison Realty Co., 1 N.Y.3d 470, 475 (2004)).
2.4. Choice of Law Issues. The Fund and Keinan fault Plaintiffs for failing to provide any guidance on Israeli law, even though the Facility Agreements, by extension the Side Letter, and by express provision the Omnibus Agreement all say that they are governed by Israeli law.
But the Defendants do not contend or suggest that applicable Israeli law differs in any material way from Massachusetts law—other than with respect to what interest rates are usurious, which the Court need not address in order to decide the preliminary injunction motion.
The Court may therefore apply Massachusetts law in deciding the preliminary injunction motion without conducting any choice of law analysis and without considering Israeli law. “Only actual conflicts between the laws of different jurisdictions must be resolved.” UBS Financial Services, Inc. v. Aliberti, 483 Mass. 396, 405 n.12 (2019), quoting Kaufman v. Richmond, 442 Mass. 1010, 1012 (2004) (rescript). “Choice of law analysis is unnecessary when that choice will not affect the outcome of the case.” Kaufman, supra.
2.5. The Yanais May Sue on Behalf of MII. Defendants argue that, since Moshe Yanai has been removed as Manager of MII, he cannot cause MII to join this lawsuit as a plaintiff. That is incorrect. Under the Pledge Agreements, Moshe and Rachel Yanai have ceded their “voting and consensual rights” to the Fund, but not their other membership rights.
In the Court’s view, the Pledge Agreements do not cover the Yanais’ right as members of an LLC to sue on the company’s behalf. Paragraph 12 provides that the powers conferred on the Fund under the Pledge Agreements if there is an Event of Default “are solely to protect [the Fund’s] interest in the Pledged Collateral.” It follows that the Yanais retain the right as Members to protect MII’s interests, including to ensure that the Fund does not breach the Pledge Agreement or the UCC.
Together, the Yanais own 100 percent of the membership interests in MII. By statute, they may therefore bring suit on behalf of and in the name of MII. See G.L. c. 156C, § 56(a). Moshe and Rachel are the only members of MII, and they
 
                                                            -21-
 
implicitly authorized this lawsuit by filing their complaint. See Billings v. GTFM, LLC, 449 Mass. 281, 289 & n.18 (2007).
For present purposes, however, it does not matter whether MII is a party to this litigation. Defendants do not challenge the Yanais’ standing to sue on their own behalf. They may seek the relief proposed in their motion for a preliminary injunction whether MII joins with them as a plaintiff or not.
2.6. The SPV Guarantor Is Not a Necessary Party. Toshav’s argument that this lawsuit may not proceed unless the SPV Guarantor is joined as a plaintiff also has no merit. Indeed, Toshav cites no authority suggesting that a guarantor is a necessary party in a case like this.
The SPV Guarantor agreed in § 12.1 of the August 2023 Facility Agreement to guarantee MII’s repayment obligations under that contract. And, as discussed above, in the Omnibus Agreement the SPV Guarantor agreed for a second time to carry a ring-fencing arrangement to segregate the shares that MII owns of Infinidat.
None of that makes the SPV Guarantor a necessary party to this lawsuit. Here, MII and Moshe Yanai contend that they are not in breach of their contractual obligations. If that were correct, then SPV Guarantor would owe nothing under its guaranty. See Cadle Co. v. DeVincent, 57 Mass. App. Ct. 13, 16 (2003); see also Merchants Nat. Bank v. Stone, 296 Mass. 243, 251 (1936) (guarantor’s obligations “are coextensive with those of the principal obligor”). If that is not correct, then the Fund may be able to collect against SPV Guarantor with respect to any amounts owed by MII under the August 2023 Facility Agreement.
But Plaintiffs do not seek in this litigation to contest or litigate SPV Guarantor’s contractual obligations as a guarantor, or otherwise. It is therefore not a necessary party to this action.
Since relief may be granted as between the parties that are before the court, without “affect[ing] the rights of those who are not,” any missing parties “are not indispensable parties.” Franks v. Markson, 337 Mass. 278, 284 (1958); accord Kitras v. Town of Aquinnah, 64 Mass. App. Ct. 285, 291-296, rev. denied, 445 Mass. 1109 (2005) (Federal agency with legal interest in subject matter of State civil action not an indispensable party where relief may be granted against existing defendant without infringing legal rights of Federal agency).
 
                                                            -22-
 
3. Motion to Strike. The motion by the Fund, Scintilla Holdings, and Keinan to strike Plaintiff’s reply memorandum and their three reply declarations is without merit. The Court will therefore deny this motion.
It was entirely appropriate for Plaintiffs to respond in their reply brief to Defendants’ arguments as to personal jurisdiction. A plaintiff has no burden to establish that a court may exercise personal jurisdiction until a defendant actually challenges the assertion of such jurisdiction. von Schonau-Riedweg,    95 Mass. App. Ct. at 483; accord, e.g., Roch v. Mollica, 481 Mass. 164, 165 (2019). Plaintiffs could not have known until they saw the opposition memoranda whether Defendants would waive any challenge to personal jurisdiction. Cf. D.F. Pray, Inc. v. Wesco Ins. Co., 103 Mass. App. Ct. 325, 329 (2023) (“An objection to personal jurisdiction ‘may be waived by conduct, express submission, or extended inaction.’ ”) (quoting Lamarche v. Lussier, 65 Mass. App. Ct. 887, 889 (2006)). Under the circumstances, where Defendants have taken control of and are seeking to sell a Massachusetts limited liability company, the Court does not fault Plaintiffs for not anticipating that they would have to respond to a challenge to the exercise of personal jurisdiction.
Similarly, once the Fund made clear in its opposition the extremely limited nature and scope of its efforts to sell the Yanais’ membership interests in MII, it was appropriate for Plaintiffs to respond in their reply memorandum and to offer expert testimony as to whether those efforts are commercially reasonable, and thus whether they can satisfy the requirements of the UCC, under the circumstances of this case. Expert opinion about commercial reasonableness is admissible where it would assist the fact finder. See generally B & R Supermarket, Inc. v. Visa Inc., 2024 WL 4322013, at *15 (E.D.N.Y. Sept. 20, 2024) (collecting cases).
The challenge to the declaration of Ronen Roytman on relevance grounds is unavailing. Though Mr. Roytman’s discussion of financing alternatives may have no bearing on likelihood of success issues, it is potentially relevant to the balance of harms from enjoining versus permitting the currently-planned sale of the Yanais’ membership interests in MII. And the assertion that Mr. Roytman should not be permitted to offer hearsay testimony is without merit. Reliable hearsay may be considered and credited by a judge in deciding whether to issue a preliminary injunction. See Planned Parenthood League of Massachusetts, Inc. v. Operation Rescue, 406 Mass. 701, 711 & n.9 (1990) (“The possible inadmissibility of evidence can be taken into account by the judge in according
 
                                                            -23-
 
proper weight to the evidence, but does not prevent the judge from considering the evidence” in deciding whether to issue a preliminary injunction.).
That Moshe Yanai’s declaration allegedly repeats information that was already contained in the verified complaint is hardly a compelling reason to strike it. Redundant or cumulative evidence may be unnecessary, but the Fund and Keinan suffered no prejudice as a result.
The Court agrees with the Fund and Keinan that it should not consider assertions in Yanai’s declaration that contradict factual allegations in the verified complaint. As noted in footnote 2 above, all Plaintiffs are bound by the factual allegations in their verified complaint. See G.L. c. 231, § 87 (“In any civil action pleadings … shall bind the party marking them.”). But this provides no ground for striking any part of Yanai’s declaration.
In any case, the Fund and Keinan have not shown that they have been unfairly prejudiced by any assertion of new arguments in Plaintiffs reply memorandum, or by the presentation of new evidence in the reply declarations that Plaintiffs filed in support of their motion for a preliminary injunction. The Fund and Keinan did not seek leave to submit any kind of rebuttal. Nor have they identified any legal or factual issue that they were unable to raise, discuss, or explain in full.
Since the Fund and Keinan have not shown that they were unfairly prejudiced by the reply arguments or declarations, the Court will also exercise its broad discretion to deny the latest motion to strike. See Teamsters Local Union No. 404 v. Secretary of Admin. & Finance, 434 Mass. 651, 661 n.12 (2001) (Superior Court judge did not abuse discretion in denying plaintiff’s motion to strike late-filed affidavit, submitted in support of motion for summary judgment, because admission of affidavit without permitting examination of affiant at a deposition caused no unfair prejudice); Commonwealth v. Nadal-Ginard, 42 Mass. App. Ct. 1, 13 (1997) (denying motion to strike portions of appellate brief because party suffered no prejudice).
4. Merits of Motion for Preliminary Injunction. So let us turn, at long last, to the merits of Plaintiffs’ request for preliminary injunctive relief.
“Trial judges have broad discretion to grant or deny injunctive relief.” Lightlab Imaging, Inc. v. Axsun Technologies, Inc., 469 Mass. 181, 194 (2014). “To obtain a preliminary injunction, the applicant must show a likelihood of success on the merits of the underlying claim; actual or threatened irreparable harm in the
 
                                                            -24-
 
absence of injunction; and a lesser degree of irreparable harm to the opposing party from the imposition of an injunction.” Wilson v. Commissioner of Transitional Assistance, 441 Mass. 846, 860 (2004).
4.1. Exercising the Yanais’ Voting Rights and Acting on Behalf of MII. Plaintiffs are almost certainly not going to succeed in proving that the Fund acted unlawfully in exercising the Yanais’ voting rights, removing Moshe Yanai as Manager of MII, or appointing Boaz Toshav as the new Manager.
As a result, Plaintiffs are not entitled to an injunction barring the Fund from acting as attorney-in-fact to exercise the Yanais’ voting rights as members of MII, to bar Toshav from acting as Manager of MII, or to bar any of the Defendants from otherwise acting on behalf of MII. In the absence of a showing that the party seeking a preliminary injunction has a likelihood success on the merits, “the remaining factors become matters of idle curiosity.” Lieber v. President and Fellows of Harvard College, 488 Mass. 816, 822 (2022), quoting Foster
v. Commissioner of Correction, 484 Mass. 698, 712 (2020), quoting in turn Maine Educ. Ass’n Benefits Trust v. Cioppa, 695 F.3d 145, 152 (1st Cir. 2012). The Court will therefore deny this aspect of the preliminary injunction motion.
As discussed above in § 1.3 of this decision, Yanai failed to disclose to the Fund that MII sold $9.8 million worth of eToro shares in December 2024. That sale triggered MII’s contractual obligation under the Side Letter to pay the entire amount of those proceeds to the Fund, but MII breached that obligation. Since this Event of Default as to the February 2023 Facility Agreement was not disclosed to the Fund before execution of the Omnibus Agreement, it was not covered by the conditional waiver. This one breach, standing alone, was sufficient to trigger the Fund’s right under the Pledge Agreements to exercise the Yanais’ voting rights as Members of MII.
In addition, and as also discussed above in § 1.3, MII breached the Omnibus Agreement before the Fund’s January 27, 2025, notice of default by not providing a report of its assets and liabilities, not procuring the required pledge of membership interests in Boston Helicopters, and not instructing three of MII’s portfolio companies (eToro, Arineta Ltd., and Infinidat) that they could not sell or dispose of any equity interest of MII without the Fund’s consent.
By the express terms of the Omnibus Agreements, these breaches were all Events of Default under the Facility Agreements and also rendered null and void the Fund’s conditional waiver of prior, known Events of Default, including MII’s failure to pay interest and principal on the loans when due as
 
                                                            -25-
 
well as its September 2024 breach of the Side Letter by selling eToro shares without paying all of the proceeds to the Fund.
As a result, the Fund was entirely within its rights under the Pledge Agreements to exercise the Yanais’ voting rights as Members of MII, remove Moshe Yanai as Manager of MII, and appointed Toshav as the new Manager.
The Plaintiffs’ assertion that Toshav cannot serve as Manager because he is not a Member of MII is without merit. MII’s operating agreement provides in § 10.04 that it “shall be construed and enforced in accordance with” the Massachusetts Limited Liability Company Act. That statute provides that “[a] manager need not be a member of the limited liability company.” G.L. c. 156C, § 25. The operating agreement, which states in § 8.03 that “Managers may be selected from among the Members (or may be admitted, as both Managers and Members to the Company)” does not negate the requirement that the agreement be construed in accordance with the LLC statute and does not bar the appointment as manager of a qualified person who is not and does not become a member of MII.
4.2. Planned Sale of Ownership Interests in MII. Even though the Fund is now entitled under the Pledge Agreements to sell the Yanais’ membership interests in MII, the Court finds and concludes that Plaintiffs are very likely to succeed in proving that the planned sale of those interests is not commercially reasonable and therefore would be unlawful, that Plaintiffs are likely to suffer irreparable harm if the sale goes forward as planned, and that the Fund will suffer no harm if the sale is temporarily barred. The Court will therefore allow this aspect of Plaintiffs’ motion.
In the exercise of its discretion, the Court will enter a preliminary injunction barring any such sale without further court order, and will not require Plaintiffs to post any security before that order takes effect.
4.2.1. Likelihood of Success on Contract and UCC Claims. The Pledge Agreements constitute contracts between the Yanais and the Fund, even though they were signed only by the Yanais and delivered to the Fund. See Dana v. Wildey Sav. Bank, 294 Mass. 462, 465 (1936); Whitman v. Boston Terminal Refrigerating Co., 233 Mass. 386, 389 (1919). The prior loans to MII, made by the Fund before the Yanais executed each Pledge Agreement, constituted sufficient consideration. See, e.g., Central Vermont Public Service Corp. v. Eitapence, 34 A.2d 184, 185 (Vt. 1943). Plus, the recitals in the Pledge Agreements that they were being entered into “for good and valuable consideration, the receipt and
 
                                                            -26-
 
sufficiency of which is hereby acknowledge,” are prima facie evidence of consideration. Finegan v. Prudential Ins. Co. of America, 300 Mass. 147, 153 (1938).
Since the Pledge Agreements provide that they are governed by Massachusetts law, it follows that “[e]very aspect” of any disposition of the collateral security posted by the Yanais, “including the method, manner, time, place, and other terms, must be commercially reasonable.” See G.L. c. 106, § 9-610(b). Failure to comply with these UCC requirements would constitute a breach of the Pledge Agreements.
It is mind-boggling that anyone seeking to sell an investment company like MII—with ownership interests in a complex portfolio of businesses, some of which appear to be quite valuable and most of which are based in Israel— would do so by running two opaque announcements in the print edition of the Wall Street Journal without making any real effort to elicit interest and bids. The only reasonable inference from the current record is that the Fund is going through the motions of a public sale with the intent that the Fund will be the sole bidder and be able to purchase MII on the cheap, with the hope and expectation that MII is (as Plaintiffs contend) worth far more than the total amount that MII now owes to the Fund.
The Court finds and concludes that it is very likely that Plaintiffs will succeed in proving that the Fund’s actions in seeking to sell MII in this manner are not commercially reasonable as required by the UCC and thus will constitute a flagrant breach of the Pledge Agreements. Though Massachusetts appellate courts have not firmly decided the issue, it appears that the burden of proving that a sale of collateral security is commercial reasonable is on the creditor, which in this case is the Fund. See G.L. c. 106, § 9-626(a)(2); Shawmut Bank, N.A. v. Chase, 34 Mass. App. Ct. 266, 270 (1993); In re Replogle, 929 F.2d 836, 838 (1st Cir. 1991) (applying Massachusetts law). Nonetheless, if the burden of proving lack of commercial reasonableness were on the Plaintiffs, they have done so.
To determine whether efforts to sell a security interest are commercially reasonable, courts must consider “the competence and aggressiveness of the marketing effort.” Wells Fargo Bus. Credit v. Environamics Corp., 77 Mass. App. Ct. 812, 820 (2010), quoting Pemstein v. Stimpson, 36 Mass. App. Ct. 283, 291 (1994). For example, a court must evaluate whether the seller “pursued commercially reasonable avenues for marketing and selling” the security. Id. at 821. Other relevant factors include “whether the time between the sale and notice was too short or too long,” as well as “whether the seller permitted
 
                                                            -27-
 
necessary inspections by prospective bidders.” Id. at 820, quoting 4 White & Summers, Uniform Commercial Code § 34-11, at 464–466 (6th ed. 2010).
The Court credits the opinions of Heidi Lipton, as set forth in her declaration. As managing director and founding partner of Rock Creek Advisors, LLC, Lipton has substantial experience in financial restructuring and with the sale of distressed assets. Her opinion is highly probative because “[s]ales of collateral not held within a ‘recognized market’ (such as a stock market or other market fixing a value to a commodity) must conform ‘with reasonable commercial practices among dealers in the type of property that was the subject of the disposition.’ ”Wells Fargo, 77 Mass. App. Ct. at 819, quoting G.L. c. 106, § 9–627(b)(1) & (3).
Based on Ms. Lipton’s persuasive declaration, and the other evidence submitted by the parties, the Court finds that the planned sale of the Yanais’ membership interest in MII will not be commercially reasonable for the following reasons.
o          Defendants have made no attempt to develop a target list of potential buyers or to plan and implement a comprehensive marketing and sales strategy that would be appropriate if one were making a good faith effort to sell MII to the highest bidder. That would be a critically important component of any commercially reasonable effort to sell assets like MII.
o          Defendants have made no meaningful attempt to provide notice of the planned sale outside of the United States. Especially since most of MII’s portfolio companies are Israeli, it is not reasonable for the Fund to make no attempt whatsoever to reach out to potential buyers that do not read The Wall Street Journal.
o          There is no evidence that Defendants have actively tried to solicit potential buyers by preparing and circulating a detailed sales memorandum that would provide an overview of the assets owned by MII, information demonstrating the value of those assets, and a rationale for investing in those assets by purchasing MII. Once again, that would be an important part of any commercially reasonable plan to sell MII.
o          There is no evidence that Defendants have established a virtual data room to provide interested parties that sign a non-disclosure
 
                                                            -28-
 
agreement with access to the full panoply of information and documentation that interested bidders would need to evaluate MII, decide whether to make a bid, and if so determine an appropriate bid price. Without such a resource, the Fund’s representation in its advertisement that it will make more information available to potential bidders that sign an NDA is illusory.
o          The Fund is not conducting an auction process, but instead has announced that it will solicit a single round of bids and accept the highest one. For an asset like MII, that is not a commercially reasonably way to obtain the highest price.
o          The Fund’s reservation of the right to change the terms of the sale at any time, including after bids were submitted, is also quite likely to discourage potential bidders from participating.
o          Requiring any successful bidder to pay the full purchase price immediately without conditions and without any escrow structure is highly irregular and creates significant risk for potential bidders.
o          Even if the Fund had received any initial expressions of interest, the timeline it established for this sale would scare off potential bidders. The Fund published its notices in The Wall Street Journal 30 days and then again 16 days before March 20, 2025, which is the date by which bids must be submitted. This truncated period does not come close to providing sufficient time for potential bidders to conduct due diligence with respect to MII’s portfolio of investments.
o          Finally, Defendants’ failure to present evidence showing that any potential bidders have submitted a bid, executed an NDA, or even expressed the slightest interest in learning more about MII is powerful confirmation that the Fund is not undertaking a commercially reasonable process to sell MII.
Considering these circumstances as whole, the Court concludes that Plaintiffs are very likely to succeed in proving that the process undertaken by the Fund to sell the Yanais’ membership interests in MII is not and does not come close to being commercially reasonable, and that any sale pursuant to this process would violate the UCC and the Pledge Agreement.
Indeed, the Fund’s conduct of the planned sale is so far from commercially reasonable that the Plaintiffs appear very likely to succeed in proving that
 
                                                            -29-
 
completion of the sale as planned would violate the Fund’s contractual and statutory duty to act in good faith in exercising its rights under the Pledge Agreement. See generally Weiler v. PortfolioScope, Inc., 469 Mass. 75, 82 (2014) (every contract governed by Massachusetts law includes an implied covenant of good faith and fair dealing, which provides “that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract”); G.L. c. 106, § 1-304 (“every conduct or duty” under the Massachusetts UCC “imposes an obligation of good faith in its performance and enforcement”).
4.2.2. Likelihood of Success on Tortious Interference Claims. For much the same reasons, the Yanais have shown that they are very likely to succeed on their tortious interference claim against Keinan and Toshav.
To succeed on their claim for intentional interference with contractual relations, the Yanais will have to show that: “(1) [they] had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.” Weiler v. PortfolioScope, Inc., 469 Mass. 75, 84 (2014), quoting G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991).
Here, it is undisputed that the Yanais entered into the Pledge Agreements at the insistence of the Fund and in connection with MII’s and Moshe Yanai’s contractual relationship with the Fund. The current record suggests that the Yanais will likely succeed in proving that: (I) the Yanais had contracts with the Fund; (ii) Keinan and Toshav knowingly induced the Fund to breach its contractual obligations to the Yanais by working with MII to sell off the Yanais’ membership interests through a process that does not come close to being commercially reasonable; (iii) Keinan and Toshav had the improper motive of trying to create an essentially sham sales process to enable the Fund to acquire MII as the sole bidder; and (iv) the Yanais were harmed as a result.
It therefore appears likely that the Yanais will succeed in proving this claim, even though Keinan was acting on behalf of the Fund and Toshav was acting on behalf of MII when they interfere with the Yanais’ contractual rights.
Under Massachusetts law, corporate officers and representatives are personally liable for tortious activity in which they personally participate, even if they were acting on behalf of the business entity. See, e.g., Refrigeration Discount Corp. v. Catino, 330 Mass. 230, 235 (1953) (defendant could be held liable for
 
                                                            -30-
 
conversion of property even though he was acting as corporation’s general manager and for its benefit); Townsends, Inc. v. Beaupre, 47 Mass. App. Ct. 747, 751–752 (1999) (corporate officer is liable for tort committed by the corporation that employs him if he personally participated in tort, such as by directing, controlling, approving, or ratifying the act). The same is true for members and managers of limited liability companies. “That one is not personally liable in contract or tort ‘solely by reason of being a member or acting as a manager of the limited liability company’ does not mean … that personal liability may never attach for activities undertaken on the LLC’s behalf.” Nekoroski v. Mathai, No. SUCV2011-4315-BLS1, 30 Mass. L. Rptr. 485, 2012 WL 5309524, at *6 (Mass. Super. Sept. 28, 2012) (Billings, J.), quoting G.L. c. 156C, § 22.[10]
4.2.3. Irreparable Harm. Since Plaintiffs have shown that they are very likely to succeed in proving their relevant claims against the Fund, Keinan, and Toshav, Plaintiffs’ proof that they will suffer irreparable harm if the currently planned sale of MII goes forward is more than adequate.
“What matters as to each party is not the raw amount of irreparable harm the party might conceivably suffer, but rather the risk of such harm in light of the party’s chance of success on the merits.” Hull Municipal Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., 399 Mass. 640, 644 (1987), quoting Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616 (1980). In other words,
 
--------------------------------------------
 
[10] Although the Massachusetts appellate courts have apparently not yet addressed the question, “the courts of other jurisdictions appear to be in general agreement that[,] just as with a traditional corporation, an LLC member or manager is liable for torts that s/he committed personally.” Nekoroski, supra (collecting cases in footnote 12). “An LLC member is liable for torts he or she personally commits … because he or she personally committed a wrong, not ‘solely’ because he or she is a member of an LLC.” Mbahaba v. Morgan, 44 A.3d 472, 476–477 (N.H. 2012) (New Hampshire law), quoting Allen v. Dackman, 991 A.2d 1216, 1228 (Md. 2010) (Maryland law); accord, e.g., Eurofins Panlabs, Inc. v. Ricerca Biosciences, LLC, No. CIV.A. 8431-VCN, 2014 WL 2457515, at *20 (Del. Ch. May 30, 2014) (Delaware law); Bo Phillips Co., Inc. v. R.L. King Properties, LLC I, 783 S.E.2d 445, 450 (Ga. Ct. App. 2016) (Georgia law); Board of Mgrs. of Beacon Tower Condominium v. 85 Adams Street, LLC, 25 N.Y.S.3d 233, 237 (N.Y. Supr. Ct. App. Div. 2016) (New York law); Commonwealth Land Title Ins. Co. v. M.S.I. Holdings, LLC, No. C.A. 08-217ML, 2008 WL 4681775, at *3 (D.R.I. 2008) (Rhode Island law). That is true even where a defendant committed a tort while carrying out the LLC’s business and for its benefit, just as Refrigeration Discount holds with respect to managers of traditional business corporations. See Beacon Tower Condominium, supra.
 
                                                            -31-
 
irreparable harm must be measured together with likelihood of success on a “sliding scale.” Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). “Simply stated, more of one excuses less of the other.” EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996), quoting Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150 153 (6th Cir. 1991).
The portfolio companies in which MII holds an ownership interest are not publicly traded. As a result, the Court finds that, if Defendants are allowed to consummate a sale of the Yanais’ membership interests in MII without undertaking a commercially reasonable sales process, Plaintiffs would have great difficulty in quantifying and recovering their resulting economic damage. That constitutes irreparable harm that justifies issuing a preliminary injunction.
An irreparable injury is any harm that “cannot be vindicated by litigation on the merits.” Koshy v. Sachdev, 477 Mass. 759, 770 (2017); accord Packaging Indus., 380 Mass. at 616 (irreparable injury occurs from a “loss of rights that cannot be vindicated should it prevail after a full hearing on the merits”). In other words, “[a] plaintiff experiences irreparable injury if there is no adequate remedy at final judgment.” Massachusetts Port Auth. v. Turo Inc., 487 Mass. 235, 247 (2021), quoting GTE Prods. Corp. v. Stewart, 414 Mass. 721, 724 (1993).
It follows that purely economic harm can be irreparable if there is no way to compensate for it through an award of damages in a final judgment. “The preservation of legitimate economic expectations pending the opportunity for trial is a basis for granting preliminary injunctive relief.” Loyal Order of. Moose, Inc., Yarmouth Lodge #2270 v. Board of Health of Yarmouth, 439 Mass. 597, 603 (2003) (vacating denial of preliminary injunction barring enforcement of smoking ban, where plaintiff was likely to succeed on merits and without injunction would suffer economic injury that final relief could not address), quoting Edwin R. Sage Co. v. Foley, 12 Mass. App. Ct. 20, 29 (1981) (affirming preliminary injunction barring landlord from leasing space to competitor of commercial tenant in violation of lease covenant, because leaving tenant with remedy of damages for diminished profits would be of “dubious efficacy”).
For example, if challenged conduct threatens the “very existence” of the moving party’s business, that would constitute irreparable harm. See Hull Municipal Lighting, 399 Mass. at 643–644.
“To establish irreparable harm, however, a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business.” Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 18–19 (1st Cir. 1996).” If the plaintiff
 
                                                            -32-
 
suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel.” Id. (affirming preliminary injunction ordering Baccarat to keep selling its wares to the plaintiff as required by the parties’ contract).[11]
4.2.4. Balance of Harms. The Court finds that there is little to no risk that the Fund will suffer any harm from the issuance of a preliminary injunction temporarily barring the sale of the Yanais’ membership interests in MII, and that the balance of harms therefore weighs strongly in favor of granting such injunctive relief.
The Court is not permanently barring the Fund from selling the Yanais’ membership interests. It is entering a preliminary injunction barring any sale or other disposition of those interests for now, because the record shows that the Fund has not done much of anything to ensure that its currently planned
 
--------------------------------------------
 
[11] As Plaintiffs acknowledge in their memorandum, the Supreme Judicial Court has noted the general rule that, in most cases, “[e]conomic harm alone … will not suffice as irreparable harm unless ‘the loss threatens the very existence of the movant's business.’ ” Tri-Nel Mgmt., Inc. v. Bd. of Health of Barnstable, 433 Mass. 217, 227–228 (2001), quoting Hull Municipal Lighting Plant, 399 Mass.    at 643.
But Tri-Nel Mgmt. did not address whether a likely economic loss the value of which cannot readily be quantified may also constitute irreparable harm, as that was not at issue in that case. Though the plaintiff in Tri-Nel argued that the challenged smoking ban would cause a loss of business income, the SJC did not address whether the claimed damages would be provable at trial if the plaintiff were to succeed on its claim. “Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.” McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 719 n.12 (1990), quoting Webster v. Fall, 266 U.S. 507, 511 (1925).
Furthermore, the sentence quoted above from Tri-Nel is non-binding dictum. The SJC held in Tri-Nel that the plaintiff’s failure to establish any likelihood of success on the merits was “sufficient to deny injunctive relief.” See Tri-Nel Mgmt., 433 Mass. at 227. This means that the following brief discussion of irreparable harm was unnecessary. See Lieber, 488 Mass. at 822. Statements by appellate courts that are “unnecessary to the holding of the case” are “merely dicta” and are not binding. See Town of Dartmouth v. Greater New Bedford Regional Vocational Technical High School Dist., 461 Mass. 366, 381 (2012); accord, e.g., Commonwealth v. Rahim, 441 Mass. 273, 284 (2004) (dictum in prior SJC decision is entitled to “little weight”).
 
                                                            -33-
 
sale will be conducted in a commercially reasonable manner. As discussed above, however, the Fund remains free to plan and then seek leave of court to conduct a commercially reasonable sale.
In the meantime, the Fund has more than adequate security. Plaintiffs have presented evidence that MII’s investment portfolio is worth more than $1 Billion. Though the Fund believes that estimate is excessive, based on the current record the Court finds that the Fund’s security interest in the Yanais’ membership interests in MII is probably worth hundreds of millions of dollars, and thus many times the amount that MII currently owes the Fund.
4.2.5. No Bond Required. In the exercise of its discretion, the Court finds that there is good cause not to require Plaintiffs to post any security before obtaining a preliminary injunction temporarily barring any sale or other disposition of the Yanais’ membership interests in MII. Cf. Petricca Const. Co. v. Commonwealth, 37 Mass. App. Ct. 392, 400–401 (1994) (court has discretion to issue preliminary injunction without requiring moving party to post security). Since the Fund faces little to no risk that it will suffer any harm from the issuance of such an injunction, it would be unnecessary and inequitable to require Plaintiffs to post a bond before the injunction may issue.
4.3. Request for Accounting of Indebtedness. Though Plaintiffs have asked the Court to order the Fund to comply with G.L. c. 106, § 9-210, and provide an accounting of MII’s indebtedness, they present no argument and have made no showing as to why such an order is necessary. As discussed above, MII has stipulated in written contracts as to the outstanding principal that it owes to the Fund, and as to the interest that it owed as of December 31, 2024, excluding additional interest owed because the interest rate was increased to 23 percent annually (assuming that an interest rate above 20 percent is enforceable, notwithstanding Massachusetts law to the contrary). During oral argument counsel for the Fund agreed to provide an accounting of any additional amounts that the Fund contends is owed to it by MII. In the exercise of its discretion, the Court sees no need to enter a court order compelling the Fund to provide the accounting that it is already obligated by statute to provide, and that it agreed in open court that it will provide.
 
                                                            -34-
 
ORDERS
The Court orders that plaintiffs Moshe Yanai and Rachel Yanai have completed service of process on all Defendants because they are and were authorized, nunc pro tunc to February 28, 2025, to effect service of process:
(a) on Zack Keinan, and through him upon Scintilla Holdings, Ltd., as General Partner of Scintilla Fund L.P., by causing copies of the summonses, complaint, motion for preliminary injunctive relief, and related papers filed by Plaintiffs in this case to be (I) delivered by hand and left at Mr. Keinan’s last known residence in Tel Aviv-Jaffa, Israel, (ii) delivered by overnight mail to counsel for Mr. Keinan, Scintilla Holdings, and Scintilla Fund at Gornitzki & Co. in Tel Aviv, Israel, and at Chapman and Cutler LLP in New York, York, and (iii) delivered by email to Mr. Keinan and to his attorneys at their business email addresses; and
(b) on Boaz Toshav by causing the same papers to be (I) delivered to Mr. Toshav’s business office in London, England, and (ii) emailed to Mr. Toshav at his business email address.
The motion by defendants Keinan, Scintilla Holdings, and Scintilla Fund to strike Plaintiffs’ reply brief and reply declarations is denied.
The motion by Moshe Yanai, Rachel Yanai,  and Michal International Investment LLC (“MII”) for preliminary injunctive relief is allowed in part to the extent that the motion seeks an order temporarily barring any sale of the Yanais’ membership interests in MII. This motion is otherwise denied.
The Court will conduct an initial Rule 16 scheduling conference on May 21, 2025, at 2:00 p.m. If counsel would prefer that this conference take place by videoconference they should contact the session clerk well in advance.
/s/Kenneth W. Salinger
Justice of the Superior Court
March 20, 2025